**Phyllis A. HUDDLESTON, Administratrix of the Estate of Jonathan Alan Huddleston, and in her own right, Robert Eyer, Esquire, Co-Administrator of the Estate of Jonathan Alan Huddleston, Appellant,**

v.

**INFERTILITY CENTER OF AMERICA, INC., Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 27, 1997.

Filed Aug. 20, 1997.

Jane E. Lessner, Philadelphia, for appellants.

William T. Jackson, Jenkintown, for appellee.

Before TAMILIA, HUDOCK and SAYLOR, JJ.

SAYLOR, Judge.

Phyllis A. Huddleston (Appellant) appeals from the trial court's order dismissing her complaint with prejudice and granting the preliminary objections in the nature of a demurrer filed by the Infertility Center of America (ICA). Having carefully considered the issues presented in this case, together with the relevant legal authorities, we reverse in part, and affirm in part.

The salient facts and procedural history of this case may be summarized as follows. ICA is a surrogacy business operated by a Michigan attorney, Noel Keane. ICA recruits women to be impregnated with the sperm of prospective fathers for the purpose of creating a child. In the typical surrogacy situation, the child is then raised by the sperm-donor father and his wife.

In 1993, in response to ICA's advertisements, Appellant contacted ICA to express an interest in becoming a "surrogate" mother. At approximately the same time, James A. Austin, a single twenty-six year old male, contacted ICA for assistance in becoming a father. Austin paid a fee to ICA for its services, and ICA brought Appellant and Austin together for the purpose of creating a child.

On November 24, 1993, Appellant agreed, in writing, to be artificially inseminated with Austin's sperm, and to release any child born of the surrogacy undertaking to Austin's sole custody. The agreement, entitled "Surrogate Parenting Agreement," was drafted by ICA and provided that Austin would pay for all medical expenses incurred by Appellant in connection with the pregnancy which were not covered by her own medical insurance. Additionally, the contract provided that Austin would pay Appellant a surrogate fee of $13,000.00 upon the child's birth. In the event of a miscarriage or stillbirth, Appellant's fee was to be prorated with reference to the number of days that elapsed from insemination.

Pursuant to the agreement, Appellant was impregnated with Austin's sperm. Thereaf-

ter, on December 8, 1994, a baby boy, Jonathan, was born to Appellant in the state of Indiana. On December 9, 1994, Austin, together with an ICA representative, arrived in Appellant's hospital room to take physical custody of Jonathan. At that time, Appellant transferred Jonathan to his sperm-donor father, Austin.

Austin took his newborn son to his residence in Bethlehem, Pennsylvania, where he repeatedly abused Jonathan, causing him to suffer severe head and brain injuries, including "shaken baby syndrome." One month after his birth, on January 8, 1995, Jonathan was admitted to Muhlenberg Hospital, and was transferred shortly thereafter to Children's Hospital in Philadelphia. Jonathan died as a consequence of these injuries on January 17, 1995.[1]

On April 10, 1995, Appellant filed wrongful death and survival actions in the U.S. District Court for the Eastern District of Pennsylvania seeking damages from ICA on the theories of negligence, breach of fiduciary duty, negligent infliction of emotional distress, and fraud. Thereafter, upon agreement of the parties, the matter was removed from federal court. The case continued in the Northampton County Court of Common Pleas.

On October 2, 1995, ICA filed preliminary objections in the nature of a demurrer based on the lack of a causal connection between the factual allegations contained in Appellant's complaint and her alleged damages. ICA's preliminary objections did not challenge Appellant's standing to bring the wrongful death and survival actions.

In ruling on ICA's preliminary objections, the trial court determined, on its own initiative, that Appellant lacked standing to maintain a wrongful death action under 42 Pa. C.S.A. § 8301 because she did not stand in a "family relation" to the decedent. The court also held that, in any event, Appellant had failed to state a cause of action because the risk that a child would be murdered by his biological father was not legally foreseeable. Thus, ICA's demurrer was granted as to all

counts of Appellant's complaint, and this appeal followed.

On appeal, Appellant contends that the trial court erred in granting ICA's demurrer. "[A] demurrer is a preliminary objection that the pleadings fail to set forth a cause of action upon which relief can be granted *under any theory of law*." *Sutton v. Miller*, 405 Pa.Super. 213, 221, 592 A.2d 83, 87 (1991) (emphasis in original).

An appeal from an order granting preliminary objections in the nature of a demurrer is subject to plenary review. *Morgan v. McPhail*, 449 Pa.Super. 71, 73, 672 A.2d 1359, 1360 (1996). In such review:

we accept as true all well-pleaded material facts in the complaint, as well as all inferences reasonably deducible therefrom. Preliminary objections should be sustained only when it appears with certainty that, upon the facts averred, the law will not permit recovery by the plaintiff.

*Id.* (citations omitted).

"In reviewing the grant of a demurrer, we are not bound by the inferences drawn by the trial court nor are we bound by its conclusions of law. Moreover, the novelty of a claim or theory, alone, does not compel affirmance of a demurrer." *Neff v. Lasso*, 382 Pa.Super. 487, 490, 555 A.2d 1304, 1305 (1989), *alloc. denied*, 523 Pa. 637, 565 A.2d 445 (1989) (citation omitted). Finally, when a doubt exists as to whether a demurrer should be sustained, we will resolve this doubt in favor of overruling it. *Snyder v. Speciality Glass Products, Inc.*, 441 Pa.Super. 613, 618, 658 A.2d 366, 368 (1995).

In this appeal, we must address the following issues:

I. Does Appellant lack standing to maintain the present wrongful death and survival actions?

II. Can a surrogacy agency be held liable for harm which occurs to a child born as a consequence of a surrogacy undertaking based on the agency's failure to exercise

---

1. On August 7, 1995, Austin pled guilty to murder of the third degree, and endangering the welfare of a child.

reasonable care in designing and supervising its surrogacy program?

III. Is child abuse a foreseeable risk of the surrogacy undertaking?

IV. Was Austin's intervening criminal act of murder a superseding cause of Jonathan's injuries?

V. Has Appellant stated a viable cause of action for fraud?

VI. Has Appellant stated a viable cause of action for breach of a fiduciary duty?

VII. Has Appellant stated a viable claim for negligent infliction of emotional distress?

VIII. Did the trial court err in failing to consider whether punitive damages are an appropriate remedy in this case?

■■■ A threshold issue in this case is Appellant's standing to maintain the present wrongful death and survival actions. As noted, ICA's preliminary objections did not challenge Appellant's capacity in this regard, and therefore, despite the trial court's *sua sponte* consideration of this issue, we conclude that it has been waived. "The issue of incapacity to sue is waived unless it is specifically raised in the form of a preliminary objection or in the answer to the complaint." *Erie Indemnity Co. v. Coal Operators Casualty Co.*, 441 Pa. 261, 265, 272 A.2d 465, 467 (1971). *See also* Pa.R.C.P. No. 1028.[2]

Separate and apart from the issue of standing, however, the trial court concluded, in granting ICA's demurrer, that Appellant was not entitled to maintain the present wrongful death and survival actions because it was not reasonably foreseeable that a father could so badly abuse his biological child that death would result. On appeal, Appellant contends that the trial court's conclusion

in this regard was error, and that the trial court's order granting the demurrer should be reversed.

ICA, on the other hand, claims that Appellant has not stated a viable cause of action, such that the demurrer should be sustained. Specifically, ICA contends that it cannot be liable for the harm which occurred in this case because it had no affirmative duty of protection with regard to the participants of its surrogacy program, and further, even if it did have a general duty to protect its client-participants from foreseeable harm, the risk of child abuse at the hands of a sperm-donor father is not legally foreseeable. Finally, ICA argues that father's criminal act of murder was an intervening and superseding cause of the injuries suffered by the baby and his mother, which serves to insulate ICA from liability in the present case.

■■■ We begin our analysis by considering the following question: Is there a duty owed by a surrogacy clinic to the participants of a program which is specifically designed to create a child outside the boundaries of the traditional nuclear family setting? "Whether a defendant owes a duty of care to a plaintiff is a question of law." *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (1993). "It has long been hornbook law that a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *Amarhanov v. Fassel*, 442 Pa.Super. 111, 115, 658 A.2d 808, 810 (1995).

Duty, as a concept, is a flexible notion. "In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular

---

2. Furthermore, even if ICA's right to challenge Appellant's standing had not been waived by its failure to raise the issue in a timely manner, we would nevertheless conclude that Appellant is the proper plaintiff under both 42 Pa.C.S.A. § 8301(d) and § 8302 based on her unchallenged status as the decedent's personal representative, letters of administration having been issued to her by the Northampton County Clerk of Orphan's Court on February 22, 1995.

42 Pa.C.S.A. § 8301(d) provides that "If no person is eligible under subsection (b) [dealing with beneficiaries] to bring an action under this

section, the personal representative of the deceased may bring an action for the damages expressly specified in subsection (c) [such as reasonable hospital, medical, funeral and administration expenses]."

42 Pa.C.S.A. § 8302 provides that "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff...." A survival action is brought by the administrator of a decedent's estate in order to recover loss to the estate of the decedent resulting from a tort. *Kiser v. Schulte*, 538 Pa. 219, 226, 648 A.2d 1, 4 (1994).

plaintiff is entitled to protection' from the harm suffered." *Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 82, 675 A.2d 314, 319–320 (1996), quoting *Gardner by Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 454–455, 573 A.2d 1016, 1020 (1990), quoting *Sinn v. Burd*, 486 Pa. 146, 164, 404 A.2d 672, 681 (1979). Furthermore, "[d]uty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the question...." *Id.* "To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times." *Id.*

Here, Appellant maintains that ICA had a duty to conduct psychological screening and/or perform a criminal investigation of all prospective parents in order to prevent foreseeable risks of the surrogacy undertaking, including that which occurred here, to wit, unspeakable acts of physical abuse resulting in a child's death.

Due to the dearth of binding legal authority regarding the duty owed by a surrogacy clinic to its client-participants, Appellant cites a recent case decided by the United States Court of Appeals for the Sixth Circuit, *Stiver v. Parker*, 975 F.2d 261 (1992), as persuasive authority for her claim that she and her newborn son were owed a duty of reasonable care by ICA based on the existence of a special relationship between them.

In *Stiver*, Noel P. Keane, who is also involved in this case, operated a surrogacy enterprise in which he acted both as a lawyer to prospective parents and as the manager of the business. Keane advertised his surrogacy program through direct advertising and television appearances as an alternative method of becoming a parent. Keane's program included no written description of the responsibilities of the clinic to its client-participants, nor of the client-participants to one another. The program made no provision for screening its client-participants for sexually transmitted diseases.

In late 1981, Alexander Malahoff contacted Keane regarding his interest in the surrogacy process; he wanted to become a father. Thereafter, in the spring of 1982, Malahoff engaged the services of Keane's surrogacy program for a nonrefundable fee of $5,000 plus costs and expenses. Around that same time, Judy Stiver read about Keane's surrogacy program in a magazine article and contacted him regarding her interest in helping infertile couples; she wanted to become a "surrogate mother." [3]

Shortly thereafter, Judy Stiver was selected to conceive and give birth to Alexander Malahoff's child. Stiver and Malahoff entered a contract whereby Malahoff would pay Stiver the amount of $10,000 upon the delivery of the child created by artificial insemination.

To that end, in April of 1982, "Judy Stiver was artificially inseminated with the fresh, untested semen of Alexander Malahoff." *Stiver, supra*, 975 F.2d at 266. A baby boy, Christopher, was born to Judy Stiver on January 10, 1983.[4] At the time of his birth, Christopher suffered from cytomegalic inclusion disease (CID) which had been transmitted to his mother, and then to him, by an active cytomegalovirus (CMV) infection in the semen of Malahoff. The symptoms of CID manifested in the boy were hearing loss, mental retardation, and severe neuro-muscular disorders.

Judy Stiver, together with her husband, brought a negligence action against Keane, and several other professionals who had participated in the surrogacy undertaking, for negligently failing to exercise a high degree of care in preventing the foreseeable risks of harm presented by surrogacy situations, including the transmission of CMV. Finding that no duty was owed by Keane to the client-participants of his surrogacy business, the trial court granted summary judgment in favor of the surrogacy broker.

---

3. As noted by the trial court, "[t]he term 'surrogate' mother, coined by advocates of commercial surrogacy, is a misnomer. The woman who bears the child is an actual mother; she is a surrogate 'wife.' " (Trial Court Opinion, pp. 8–9) (citation omitted).

4. At the time that Stiver was artificially inseminated with Malahoff's sperm, she had already been impregnated by her husband. Thus, the father of Judy Stiver's child was, in fact, her husband.

On appeal, the Sixth Circuit Court of Appeals reversed, holding that Stiver had stated a *prima facie* case of negligence, based on its "... conclu[sion] that Keane, the surrogacy business designer and broker, and the other defendant professionals who profited from the program, owed affirmative duties to the Stivers and to Malahoff, the surrogacy program beneficiaries. This duty, an affirmative duty of protection, marked by a heightened diligence, arises out of a special relationship because the defendants engaged in the surrogacy business and expected to profit thereby." *Stiver*, 975 F.2d at 268. In so concluding, the *Stiver* court relied heavily on "long established principles of tort law imposing an affirmative duty to act when parties have a 'special relationship.'" *Stiver, supra,* 975 F.2d at 269.

The *Stiver* court found that a "special relationship" was created between the surrogacy clinic, its client-participants, and the child they conceived, because the agency undertook to provide a special, sometimes perilous, service for profit, and in so doing, controlled all of the details involved in the surrogacy process. "Courts traditionally have imposed an affirmative duty in special relationship cases because the person upon whom the duty to act is imposed has assumed some special task or role and expects a benefit or profit [in return]." *Stiver, supra,* 975 F.2d at 271. When a person holds services out to the public for profit, he must be held to the highest standard of care in delivering such services, especially where the very nature of the business poses a risk of danger. "[Common] carriers, innkeepers, barbers, surgeons, and physicians" are all held to this magnified standard of care. *Id.*

Based on its conclusion that a "special relationship" existed between the surrogacy agency and its client-participants, and because there has traditionally been a strong state interest in controlling transactions involving children, such as adoptions and custody orders, the *Stiver* court held that Keane owed Stiver and her unborn child an affirmative duty of protection from foreseeable risks. Further, finding that infection from a sexually transmitted disease was a foresee-

able risk of the surrogacy process, the *Stiver* court held that a jury question had been raised regarding the negligence of the surrogacy agency in operating its business. Therefore, the Court of Appeals reinstated plaintiff's cause of action.

In another federal case, *Kleinknecht v. Gettysburg College, supra,* the United States Court of Appeals for the Third Circuit discussed the "special relationship" concept in the context of its duty analysis. In *Kleinknecht,* a twenty year-old student at Gettysburg College died of cardiac arrest while practicing lacrosse as a member of its intercollegiate lacrosse team. His parents instituted wrongful death and survival actions against the college, claiming that the college was negligent in failing to provide the proper medical attention for their son when he collapsed on the playing field. The district court granted summary judgment to the college, holding that it had no duty to anticipate and guard against the risk that a young, healthy athlete would suffer a fatal heart attack while participating in its sports program.

On appeal, the decedent's parents argued that the college owed a duty to its student athletes to implement preventive measures assuring prompt assistance and treatment in the event that a medical emergency would occur while playing a school-supervised intercollegiate athletic activity. The *Kleinknecht* court agreed, and held that Gettysburg College owed such a duty to the decedent, its intercollegiate athlete, due to the "special relationship" that was created when the college recruited him to participate in an sport which it organized and supervised, and from which it reaped many benefits, including favorable attention and increased enrollment. "Duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time...." *Kleinknecht, supra,* at 1366, quoting *Morena v. South Hills Health Sys.,* 501 Pa. 634, 642, 462 A.2d, 680, 684 (1983).

Additionally, the *Kleinknecht* court considered whether the risk of a medical emergency occurring on the lacrosse field was reasonably foreseeable. Finding that it was, the Court of Appeals concluded that a jury ques-

tion had been presented on the issue of the college's negligence in permitting the lacrosse team to practice without any provision for the prompt medical treatment of life-threatening injuries.

In this case, we conclude that a business operating for the sole purpose of organizing and supervising the very delicate process of creating a child, which reaps handsome profits from such endeavor, must be held accountable for the foreseeable risks of the surrogacy undertaking because a "special relationship" exists between the surrogacy business, its client-participants, and, most especially, the child which the surrogacy undertaking creates. Such a special relationship existed between ICA, Appellant and Jonathan in this case and thus, ICA owed them an affirmative duty of protection.

Our analysis is not at an end, however, for we must determine whether the harm suffered in this case was reasonably foreseeable. *See Griggs v. BIC Corp.*, 981 F.2d 1429, 1435 (3d Cir.1992) (foreseeability is an integral part of determination that duty exists under Pennsylvania negligence law). Although ICA attempts to frame the issue as whether it is foreseeable that a sperm-donor father would brutally *murder* his biological child, we perceive the actual issue to be whether it is reasonably foreseeable that *child abuse* could result in a surrogacy situation. "[I]n the context of duty, '[t]he concept of foreseeability means the likelihood of the occurrence of a *general* type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury.'" *Kleinknecht, supra*, 989 F.2d at 1369 (citation omitted)(emphasis added). "Although it is true that a defendant is not required to guard against every possible risk, he must take reasonable steps to guard against hazards which are generally foreseeable." *Kleinknecht, supra*, 989 F.2d at 1370 (citation omitted).

In this case, Appellant contends that the trial court erred in concluding, as a matter of law, that it is not foreseeable that a

child born as a consequence of a surrogacy contract would be seriously injured by his sperm-donor father. We agree.

First, we observe that in *Stiver*, the Sixth Circuit specifically noted that child abuse is arguably foreseeable in a surrogacy undertaking. *See Stiver, supra*, 975 F.2d at 269. Secondly, although Pennsylvania has not legislated in the area of surrogate parenting, many other states have enacted legislation addressing surrogacy situations in which the participants to a surrogacy agreement are required to undergo psychological testing. Such requirements are meant to ensure that the surrogate will be emotionally able to part with her child and that the child born of a surrogacy contract will be placed in the care of persons who will give the child love, affection and guidance. *See, e.g.*, Va.Code Ann. § 20–160(B)(7)(1991); N.H.Rev.Stat. Ann. § 168–B:18(II)(a)(1990)(Supp.1994). A jury could therefore conclude that although child abuse is an extremely disconcerting risk of the surrogacy undertaking, it is nevertheless a foreseeable one.

ICA also argues, as a matter of law, that it is not liable to Appellant because Austin's criminal act of murder is a superseding cause of the harm suffered in this case.[5] "In determining whether an intervening force is a superseding cause, the test is whether the intervening conduct was so extraordinary as not to have been reasonably foreseeable." *Powell v. Drumheller, supra*, 539 Pa. at 493, 653 A.2d at 624. In all but the clearest of cases, this foreseeability determination is one for the jury. *Id.*

ICA's argument in this regard must fail for two reasons. First, we have already determined that Austin's conduct in physically abusing his child was *not* unforeseeable as a matter of law. Secondly, "[w]e have previously recognized that criminal conduct does not act as a *per se* superseding force." *Powell v. Drumheller*, 539 Pa. 484, 493, 653 A.2d 619, 624 (1995). *See City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1153 (E.D.Pa.1982) (an actor may be held liable for his negligence notwithstanding an inter-

---

5. We note that all forms of child abuse, regardless of the severity of the resulting injuries, are criminal in nature.

vening criminal act by a third person if the actor realized, or should have realized, that the circumstances afforded the third person an opportunity to commit a tort or crime, and that the third person might avail himself of such opportunity). Therefore, whether or not it is reasonably foreseeable that a single sperm-donor father would physically abuse his newborn son to such a degree as to cause his death is a question which requires a jury's deliberation.

Because we have concluded that a "special relationship" existed between ICA and its client-participants, and also that child abuse, although tragic, is not completely unforeseeable in the surrogacy context, we further conclude that Appellant has stated a *prima facie* case of negligence which may entitle her to relief. Accordingly, we hold that Appellant is entitled to proceed with her causes of action for negligence under both the wrongful death and survival statutes in her capacity as administratrix of Jonathan's estate.

■ Next, we consider whether Appellant has stated a viable cause of action for fraud. In order to state such a claim, the following elements must be pled with particularity in a plaintiff's complaint: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). The complaint must provide sufficient facts to support a plaintiff's contention that the defendant intended to induce him to act based on the misrepresentation. *Bash v. Bell Telephone Co. of Pennsylvania*, 411 Pa.Super. 347, 361, 601 A.2d 825, 832 (1992).

■ Here, Appellant's complaint avers that ICA represented its program to be the "premier" surrogacy program in the country, and that it was designed and implemented to ensure the safety of its client-participants. ICA also allegedly represented to Appellant that her surrogacy situation would be handled as an adoption. Further,

Appellant contends that such representations were false and that her reliance on them caused her to participate in ICA's surrogacy program, ultimately leading to Jonathan's death.

The trial court concluded, and we agree, that these representations are not sufficient to support an intent to induce by misrepresentation. ICA's representations regarding the quality of the program amounted to mere "puffing," rather than fraud. *See Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975). And its promise to treat the surrogacy undertaking as an adoption is merely an unfulfilled promise to do something in the future, which does not constitute fraud. *See Bash v. Bell Telephone Co. of Pennsylvania, supra.*

■ Appellant also argues that the trial court erred in dismissing her claim for breach of a fiduciary duty. In making this argument, Appellant relies upon *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994), where our supreme court decided that long-standing common law causes of action, such as negligence and fraud, apply in an adoption setting. Specifically, the *Gibbs* court held that an adoption agency has an affirmative duty to disclose all relevant information about a child in its possession to adopting parents because the nature of the relationship between the parties is one of trust and confidence, given that the parties are acting in a joint effort to create a family. *Gibbs v. Ernst, supra*, 538 Pa. at 215, 647 A.2d at 893.

In this case, we have likewise held that traditional notions of negligence are applicable to surrogacy situations, and therefore, that Appellant is entitled to proceed with her wrongful death and survival actions, sounding in negligence. However, Appellant's claim regarding the breach of a fiduciary duty, as distinct from her negligence claim, is unsupported by any relevant legal authority, and we therefore conclude, as did the trial court, that it is not viable.

■ Appellant next claims that she is entitled to maintain a cause of action for negligent infliction of emotional distress. In *Sinn v. Burd, supra*, the Pennsylvania Su-

preme Court enumerated several factors which must be considered by a court in deciding whether a plaintiff has stated a viable claim for the negligent infliction of emotional distress, as follows:

> (1) whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it;
>
> (2) whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence;
>
> (3) whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Id.*, 486 Pa. at 170–171, 404 A.2d at 685.

Several Superior Court decisions have recently discussed the second element of the *Sinn* test, as follows:

> The basis of recovery for a claim of negligent infliction of emotional distress is the traumatic impact of viewing the negligent injury of a close relative. A person who does not experience a sensory and contemporaneous observance of the injury does not state a cause of action for negligent infliction of emotional distress. In formulating the rule, the Supreme Court "contemplated a discrete and identifiable traumatic event to trigger recovery." In the absence of such an event, no recovery is permitted.

*Turner v. Medical Center, Beaver,* 454 Pa.Super. 645, ——, 686 A.2d 830, 832 (1996), quoting *Love v. Cramer,* 414 Pa.Super. 231, 233–235, 606 A.2d 1175, 1177 (1992), *alloc. denied,* 533 Pa. 634, 621 A.2d 580 (1992) (citations omitted).

Under the facts and circumstances of this case, Appellant has failed to state a claim for the negligent infliction of emotional distress. Although she was the natural mother of the deceased child, she was not present when he was injured, but rather was informed of the abusive event, and the child's resulting injuries, after the fact by a third person. Thus, Appellant did not suffer an emotional injury resulting from a direct and contemporaneous sensory experience of the event itself, and therefore, is unable to maintain a cause of action for negligent infliction of emotional distress. *See Yandrich v. Radic,* 495 Pa. 243, 433 A.2d 459 (1981) (father unable to recover for severe emotional injuries he sustained upon arriving at the hospital and seeing his seriously injured son, with whom he stayed until the boy's death five days later, because the father was not present at the scene when the accident transpired).

Appellant's final claim is that the trial court erred in failing to consider her entitlement to punitive damages. "Assessment of punitive damages are proper when a [defendant's] actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct, and are awarded to punish that [defendant] for such conduct." *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 493, 587 A.2d 702, 704 (1991) (citations omitted).

The trial court did not reach the issue of punitive damages because it decided that Appellant had failed to state a cause of action which would entitle her to relief, and therefore, dismissed her complaint. Since we have determined that Appellant has stated a valid claim, sounding in negligence, a decision regarding the propriety of punitive damages in this case must abide the evidence presented at trial.

In summary, we conclude that the trial court erred in dismissing Appellant's wrongful death and survival actions which seek damages for the harm caused by ICA's failure to exercise reasonable care in designing and implementing its surrogacy program. We further conclude that the trial court properly dismissed Appellant's claims for negligent infliction of emotional distress, breach of a fiduciary duty, and fraud.

Accordingly, the trial court's order of August 16, 1996 is reversed in part and affirmed in part, and the case is remanded to the trial court for further proceedings. Jurisdiction is relinquished.