Baljinder S. MATHARU and Jessica A. Matharu, Individually and as Administrators of the Estate of Milan Singh Matharu, Deceased, Appellees

v.

Scott D. MUIR, D.O., Fiorina Pellegrino, D.O., Hazleton Women's Care Center and Muir OB/GYN Associates, P.C., Appellants.

Superior Court of Pennsylvania.

Argued Nov. 18, 2010.

Filed June 28, 2011.

Aaron S. Jayman, Camp Hill, for appellants.

Timothy A. Shollenberger, Enola, for appellees.

BEFORE: FORD ELLIOTT P.J., MUSMANNO, BENDER, BOWES, DONOHUE, SHOGAN, ALLEN, OLSON and OTT, JJ.

OPINION BY MUSMANNO, J.:

Scott D. Muir, D.O. ("Dr. Muir"), Fiorina Pellegrino, D.O. ("Dr. Pellegrino"), Hazleton Women's Care Center ("Hazleton") and Muir OB/GYN Associates, P.C. ("Muir Associates") (collectively, "Defendants") appeal from the Order denying, in part, their Motion for the entry of summary judgment against Baljinder S. Matharu ("Father") and Jessica A. Matharu ("Mother"), individually and as Administrators of the Estate of Milan Singh Matharu

("Child") (collectively, "Plaintiffs"). We affirm.

The trial court set forth the undisputed facts underlying the instant appeal as follows:

1. The instant wrongful death/survival action was instituted by summons on April 25, 2007, followed by a Complaint on June 26, 2007.

2. An Answer and New Matter was filed by Defendants on October 4, 2007.

3. [Mother] gave birth to her first child ["S.M."] on February 21, 1997.

4. [Mother's] pre-natal care for [S.M.] was rendered by a physician other than Defendants herein.

5. Blood work during the 1997 pregnancy indicated [that Mother] was Rh-negative. [FN].

[FN] The designation of Rh-negative blood is relevant because of the potential effect it has on future pregnancies. Where a mother's blood is Rh-negative and the father's [blood is] Rh-positive, a child can be conceived who is Rh-positive. Although the mother's and baby's bloodstream is separate, the baby's Rh-positive blood could enter the mother's system, causing the mother to create antibodies against the Rh factor and to treat the baby like an intruder. Under these conditions, the mother is said to be sensitized or iso-immunized. To prevent this, the mother is given an injection of Rh immunoglobulin known as RhoGAM at 28 weeks [of] gestation and again within 72 hours after birth if the baby is determined to be Rh-positive.

6. [Father] was determined in 1997 to be Rh-positive.

7. After [the] delivery of [S.M., Mother] was administered RhoGAM (Rh immunoglobulin).

8. In 1997, [Mother] was aware that she was Rh-negative and that she had been administered RhoGAM.

9. In 1998, [Mother] became pregnant again, and in May, 1998, came under the care of Defendants, Dr. Muir and Dr. Pellegrino, at Defendant Hazleton Women's Care Center.

10. [Mother] was again found to be Rh-negative during this second pregnancy.

11. [Mother] was not given an injection of RhoGAM at 28 weeks [of] gestation on the second pregnancy.

12. [Mother] delivered her second child ["S."] on October 3, 1998.

13. [Mother] did not receive an injection of RhoGAM within 72 hours of this birth.

14. Following the birth of [S.] and while [Mother] was still in the hospital, [Dr.] Muir told both [Mother and Father] that no RhoGAM had been administered to [Mother] and that she had become sensitized during the third trimester.

15. The discharge summary evidences a conversation between [Dr.] Muir and [Mother and Father] regarding the ramifications of Rh sensitization, including the effects on an unborn fetus. It further indicates that [Mother and Father] stated [that] they desired no more children. The patient was advised to seek early prenatal care at the next pregnancy. [FN]

[FN] Failing to administer RhoGAM is relevant because of the harmful effect it can have on future pregnancies.

16. Within a few weeks of [S.'s] birth, [Mother and Father] contacted a law firm[,] which sought to obtain a copy of [Dr.] Muir's medical chart on [Mother].

17. After consultation with a lawyer, and within two (2) years of [S.'s] birth, [Mother and Father] did not file a lawsuit regarding the failure to administer RhoGAM.

18. In 2000, [Mother] became pregnant again, but underwent an abortion at Allentown Women's Center. [None of the

Defendants] provided any care or treatment for this pregnancy.

19. [Mother] did not receive RhoGAM at the time of her 2000 abortion.

20. In late 2001, [Mother] became pregnant a fourth time. She telephoned [Dr.] Muir and had a discussion with him regarding this pregnancy and her sensitization.

21. [Mother] returned to the care of Defendants on March 12, 200[2], at 14.3 weeks [of] gestation. [Dr.] Muir sent [Mother] to Lehigh Valley Hospital for consultation in the Department of Maternal Fetal Medicine.

22. On August 6, 2002, [Mother] gave birth to her fourth child, [M.], at Lehigh Valley Hospital.

23. The last chart note of any contact between [Mother] and Defendants' office is a call by [Mother] on July 29, 2002.

24. [Mother's] last office visit with Defendants was [on] July 8, 2002.

25. [Mother] never presented for a follow-up [postpartum] visit with Defendants after the birth of [M.]

26. Subsequent to this birth, [Dr.] Muir sent [Mother] a letter requesting her to schedule a post-partum appointment.

27. In and around March, 2003, after receiving no response, [Dr.] Muir sent a certified letter to [Mother] dismissing her from his practice. The letter was signed for and received by [Mother] on March 15, 2003.

28. As of March 15, 2003, [Mother] was no longer a patient of Defendants and no longer had a doctor-patient relationship with Defendants.

29. [Mother] suffered a miscarriage early in her fifth pregnancy on January 23, 2005.

30. In mid[-]2005, [Mother] became pregnant for a sixth time.

31. [Mother] did not consult [Defendants], and [Defendants] provided no care or treatment during this sixth pregnancy. No doctor-patient relationship was formed between [Mother] and Defendants during this sixth pregnancy.

32. For this sixth pregnancy in 2005, [Mother] received her pre-natal care from Dr. Vourtsin and the Department of Maternal Fetal Medicine at Lehigh Valley Hospital.

33. During this sixth pregnancy, [Mother] knew she was iso-immunized and that there were certain risks associated with pregnancy.

34. [Mother] became aware that she had become iso-immunized in October, 1998, after the birth of her second child, [S.]

35. [Mother's] sixth pregnancy proceeded without complication until November, 2005, or 26 weeks [of] gestation.

36. In late October, 2005, fetal blood work showed anemia, so [Mother] underwent intraperitoneal transfusion.

37. On November 10, 2005, [Mother] returned to Lehigh Valley Hospital. While undergoing a PUBS procedure with intrauterine transfusion (percutaneous umbilical blood sampling), [Child's] heart rate became non-reassuring and abruption was suspected.

38. An emergency C-section was performed on November 10, 2005. [Child] was born and then transferred to Children's Hospital of Philadelphia, where he died two days later.

In addition to the foregoing chronological undisputed facts, it is relevant to point out that the parties do agree that the negligence[,] which forms the basis for this lawsuit[,] occurred in 1998[,] when [Dr.] Muir failed to administer RhoGAM during [Mother's second preg-

nancy at 28 weeks or after the delivery of this second child. [FN] ...

[FN] Plaintiffs claim [that] Defendants failed to administer RhoGAM, failed to take an adequate history to determine the blood type of [Father], and failed to take an adequate history of [Mother] to determine if she had been administered a RhoGAM injection within 72 hours of her prior delivery.

Trial Court Opinion, 2/20/09, at 1–5 (footnotes in original).

At the close of discovery, Plaintiffs and Defendants filed their respective Motions for summary judgment. The trial court ultimately granted in part and denied in part Defendants' Motion for summary judgment. Relevant to this appeal, the trial court denied Defendants' Motion for summary judgment against Plaintiffs as to their wrongful death and survival actions.[1] Trial Court Order, 3/2/09, at ¶ 1. In its Order, the trial court further stated that its decision involved a controlling question of law as to which there is a substantial ground for difference of opinion "and that an immediate appeal from the Order may materially advance the ultimate termination of the matter." *Id.* at ¶ 4. The Defendants subsequently filed a Petition for permission to appeal the trial court's interlocutory Order, which this Court granted.

On appeal, Defendants present the following claims for our review:

A. Will Pennsylvania recognize a cause of action after the expiration of the statute of limitations where the only alleged negligence[,] which forms the basis for the lawsuit[,] occurred in 1998 during [Mother's] second pregnancy, and was known to [Plaintiffs] at that time, but it was not until after [Mother's] sixth preg-

nancy that [Plaintiffs] initiated the lawsuit in 2007[?]

B. Whether the trial court erred in denying [Defendants'] Motion for Summary Judgment on the basis of no duty when [Defendants] did not provide any care to [Mother] during her 2005 pregnancy and therefore[,] no doctor-patient relationship was formed[?]

C. Whether the trial court erred in denying [Defendants'] Motion for Summary Judgment on the basis of assumption of a known risk when [Plaintiffs] were advised that because [Mother] did not receive RhoGAM in 1998[,] she was at an increased risk for difficulties for all future pregnancies[?]

Brief for Appellants at 4.

Defendants first claim that the trial court improperly failed to enter summary judgment in their favor, arguing that Plaintiffs' negligence cause of action is barred by the applicable statute of limitations. *Id.* at 11. Defendants state that although their alleged negligence occurred in 1998, "during [Mother's] second pregnancy, and was known to [Plaintiffs] at that time," Plaintiffs did not file their lawsuit until 2007. *Id.* According to Defendants, the applicable two-year statute of limitations for medical malpractice actions began to run "when the alleged negligent act had been done, or in other words, when the duty was breached." *Id.* at 20 (quoting *Bigansky v. Thomas Jefferson Univ. Hosp.*, 442 Pa.Super. 69, 658 A.2d 423, 426 (1995)). Defendants argue that Pennsylvania has not extended a physician's duty to non-patient, third parties except in cases involving communicable diseases. Brief for Appellants at 24–25 (citing *Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623 (1999)).

1. The trial court granted summary judgment against Plaintiffs as to their cause of action

for loss of Child's consortium. *Id.* at ¶ 2.

Initially, we are cognizant of our standard of review. "Generally, in an appeal from a grant or denial of summary judgment, the appellate court's review is limited to determining whether the lower court committed an abuse of discretion or an error of law." *Stanton v. Lackawanna Energy, Ltd.*, 584 Pa. 550, 886 A.2d 667, 675 (2005). "[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Summers v. Certainteed Corp.*, 606 Pa. 294, 997 A.2d 1152, 1159 (2010) (quoting *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221 (2002); Pa.R.C.P. 1035.2(1)). If there are any material facts in dispute, or if the facts can support conflicting inferences, the case is not free from doubt, and therefore, summary judgment is inappropriate. *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 902 (2008).

> This is because a motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In other words, if there is relevant evidence that a jury could reasonably credit that would allow the non-moving party to prevail, then judgment as a matter of law would be inappropriate. In considering the merits of a motion for summary judgment, a trial court views the record in the light most favorable to the non-moving party ... and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party....

*Id.* at 902. On appellate review, then,

> ... the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of

review is *de novo.* This means we need not defer to the determinations made by the lower tribunals.

*Summers*, 997 A.2d at 1159 (quoting *Weaver*, 926 A.2d at 902–03 (internal citations omitted)). To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record. *Summers*, 997 A.2d at 1159.

 Summary judgment is appropriate if a plaintiff's cause of action is barred by the statute of limitations. *Gojmerac v. Naughton*, 915 A.2d 1205, 1206 (Pa.Super.2006). Generally, a statute of limitations period begins to run when a cause of action accrues; *i.e.,* when an injury is inflicted and the corresponding right to institute a suit for damages arises. *See* 42 Pa.C.S.A. § 5502(a); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa.2011); *Wilson v. El–Daief*, 600 Pa. 161, 964 A.2d 354, 361 (2009). An action is time-barred when the plaintiff becomes aware of the injury within the statutory period, but fails to timely file suit. *Pocono Int'l Raceway. Inc., v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983).

 Here, Plaintiffs filed wrongful death and survival actions against Defendants. The Judicial Code provides that a wrongful death action "may be brought ... to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no action for damages was brought by the injured individual during his lifetime." 42 Pa.C.S.A. § 8301(a). Regarding survival actions, the Judicial Code provides that "all causes of action or proceedings, real or personal, shall survive the death of the plaintiff or the defendant, or the death of one or more joint plaintiffs or defendants." 42 Pa.C.S.A. § 8302. Thus, the cause of action that accrues to an injured person during his or her lifetime is

separate from the cause of action accruing to the person's heirs should he/she die of that injury.

Regarding the limitations period for filing such causes of action, the Judicial Code generally provides that

[t]he following actions and proceedings must be commenced within two years:

. . .

(2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

42 Pa.C.S.A. § 5524. Further,

[t]he time within which a matter must be commenced under this chapter shall be computed . . . from the time the cause of action accrued.

42 Pa.C.S.A. § 5502(a).

In 2002, however, the Pennsylvania General Assembly passed the Medical Care Availability and Reduction of Error ("MCARE") Act.[2] The MCARE Act reformed the law on medical professional liability, and included a specific statute of repose for medical professional liability claims:

(a) **General rule.**—Except as provided in subsection (b) or (c), no cause of action asserting a medical professional liability claim may be commenced after seven years from the date of the alleged tort or breach of contract.

. . .

(d) **Death or survival actions.**—If the claim is brought under 42 Pa.C.S. § 8301 (relating to death action) or 8302 (relating to survival action), **the action must be commenced within two years after the death** in the absence of affirmative misrepresentation or fraudulent concealment of the cause of death.

40 P.S. § 1303.513(a), (d) (emphasis added). This statute of repose applies to causes of action that arise on or after its effective date, March 20, 2002. Act 2002–13, P.L. 154, § 5105(b).

In construing the general statutory language set forth in the Judicial Code, and the more specific statute of repose set forth in the MCARE Act, we are mindful that

[w]henever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S.A. § 1933.

■ Upon review we conclude that the specific statute of repose set forth at section 513(d) of the MCARE Act controls over the general statutory language of 42 Pa.C.S.A. § 5524. Pursuant to section 513(d) of the MCARE Act, Plaintiffs were required to commence their causes of action "within two years after the death" of Child. *See* 40 P.S. § 1303.513(d). Child died on November 12, 2005. Plaintiffs commenced their wrongful death/survival action by writ of summons on April 25, 2007, and filed their Complaint on June 26, 2007, within two years of Child's death. Accordingly, the trial court properly determined that Plaintiffs' Complaint was not barred by the applicable statutory limitations period.

**2.** Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. §§ 1303.101–1303.910.

■ Analysis under the more general statutory language found in the Judicial Code provides no relief to Defendants. The accrual of a survival cause of action, for deciding whether the statute of limitations has run, is different than that for a wrongful death action. *Moyer v. Rubright,* 438 Pa.Super. 154, 651 A.2d 1139, 1141 (1994).

> This difference stems from the distinct injuries the two causes of action are designed to redress. We summarized the different bases for wrongful death and survival actions in *Frey v. Pennsylvania Elec. Co.,* 414 Pa.Super. 535, 607 A.2d 796 (1992):
>
>> An action for survival damages is unlike the action for wrongful death ... Under the survival statute, survival damages are essentially those for pain and suffering between the time of injury and death. **The survival action has its genesis in the decedent's injury, not his death. The recovery of damages stems from the rights of action possessed by *the decedent* at the time of death** ....
>>
>> ...
>>
>> For the action known as a "survival action" the statute of limitations, as a general rule, begins to run on the date of injury, **as though *the decedent* were bringing his or her own lawsuit** ....
>
> *Moyer,* 651 A.2d at 1141 (citation omitted, emphasis added).

■ By contrast, a cause of action for wrongful death is not the deceased's cause of action. *Id.*

> An action for wrongful death may be brought only by specified relatives of the decedent to recover damages in their own behalf, and not as beneficiaries of the estate. Wrongful death damages are implemented to compensate the spouse, children, or parents of the deceased for the pecuniary loss they have sustained by the denial of future contributions decedent would have made in his or her lifetime.... **This action is designed only to deal with the economic effect of the decedent's death upon these specified family members.**
>
> [*Frey,*] 414 Pa.Super. at [539–40], 607 A.2d at 798 (citations omitted).

*Moyer,* 651 A.2d at 1141 (emphasis added). In wrongful death actions, the statute of limitations begins to run "when a pecuniary loss is sustained by the beneficiaries of the person whose death has been caused by the tort of another." *Id.* at 1142. "If, at the time of death, the underling negligence action would have been time barred as to [the decedent], then the wrongful death cause of action is time barred as to [his] relatives." *Id.* The wrongful death action is thus derivative of the original tortious act that would have supported the relatives' own cause of action. *Id.*

■ Defendants direct our attention to various cases holding that the statute of limitations begins to run at the time of the negligent act, or at the time the right to institute and maintain a suit arises. *See* Brief for Appellants at 20 (citing, *e.g., Wachovia Bank. v. Ferretti,* 935 A.2d 565, 572 (Pa.Super.2007); *Montanya v. McGonegal,* 757 A.2d 947, 950 (Pa.Super.2000); and *Bigansky,* 658 A.2d at 426). However, as this Court stated in *Moyer,* recovery of damages in a survival action stems from the rights possessed by the *decedent.* Further, the limitations period in a wrongful death action begins to run "when a pecuniary loss is sustained by the beneficiaries of the person whose death has been caused by the tort of another." *Moyer,* 651 A.2d at 1142. The cases cited by Defendants provide little guidance where, as here, Child sustained his injury, and Plaintiffs incurred their pecuniary loss re-

sulting from Child's death, years after the allegedly negligent act.

In this case, Plaintiffs' recovery for damages in their survival action stems from the rights of action possessed by the decedent, *i.e.*, Child, at the time of his death. *See id.* at 1141. Child did not possess any rights to proceed against Defendants until he suffered an injury. *See id.* (recognizing that the statute of limitations for a survival action began to run on the date of the decedent's injury, as though he was bringing his own lawsuit). The evidence, viewed in a light most favorable to Plaintiffs as the non-moving parties, reflects that Child suffered an injury either at his birth on November 10, 2005, or upon his death (two days later). Plaintiffs commenced their survival cause of action on April 25, 2007, well within the two-years of Child's injury. Accordingly, we discern no error in the denial of summary judgment against Plaintiffs for this cause of action.

Regarding Plaintiffs' cause of action for wrongful death, there is no evidence that Plaintiffs suffered a pecuniary loss, caused by Child's death, until at least November 12, 2005, the date of Child's death. Further, as set forth above, Child's underlying negligence action was not time-barred at the time Plaintiffs commenced their lawsuit. Thus, application of the limitations period set forth in the Judicial Code affords no relief to Defendants.

We acknowledge Defendants' contention that, as a matter of public policy, this case should not be allowed to proceed. Brief for Appellants at 23. Defendants argue that "[t]o allow this lawsuit to go forward is to subject [Defendants] here to potentially multiple claims well into the future, potentially 20 years from the date of the alleged negligence in 1998." *Id.* While we are cognizant of Defendants' concerns, the issue presented to this Court is the inter-

pretation of the applicable statute of limitations, as it presently exists. Further restrictions on the limitations period for bringing such causes of action are within the province of the Pennsylvania legislature, and not this Court.

Defendants next claim that the trial court improperly denied their Motion for summary judgment where Plaintiffs had failed to establish a duty owed to them by Defendants. *Id.* at 30. According to Defendants, they provided no care to Mother during her 2005 pregnancy, and no doctor-patient relationship was formed or existed during Mother's pregnancy with Child. *Id.* at 28. Absent a doctor-patient relationship, Defendants argue, there can be no duty owed by them to Plaintiffs. *Id.* In support, Defendants point out that Mother last saw Dr. Muir in July 2002; the doctor-patient relationship between Defendants and Mother terminated in March 2003; Mother did not become pregnant with Child until June 2005; and Defendants provided no prenatal care to Child. *Id.*

Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate the elements of negligence: a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm. *Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 981 A.2d 145, 154 (2009).

"The existence of a duty is a question of law for the court to decide." *R.W. v. Manzek*, 585 Pa. 335, 888 A.2d 740, 746 (2005) (citing *Huddleston v. Infertility Ctr. of Am., Inc.*, 700 A.2d 453, 457 (Pa.Super.1997)). "In negligence cases, a duty consists of one party's obligation to con-

form to a particular standard of care for the protection of another." *R.W.*, 888 A.2d at 746 (citing *Atcovitz,* 812 A.2d at 1222). The legal concept of duty is rooted in "often amorphous public policy considerations, which may include our perception of history, morals, justice and society." *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1169 (2000).

■ In deciding whether to impose a duty, Pennsylvania courts have adopted a five-factor test, focusing upon

(1) the relationship between the parties;

(2) the social utility of the defendant's conduct;

(3) the nature and foreseeability of the risk in question;

(4) the consequences of imposing the duty; and

(5) the overall public interest in the proposed solution.

*R.W.,* 888 A.2d at 747; *accord Montagazzi v. Crisci,* 994 A.2d 626, 631 (Pa.Super.2010).

■ We will address the first and third factors together. The imposition of a duty is predicated on the relationship that exists between the parties at the relevant time. *R.W.,* 888 A.2d at 747. Generally, the law does not impose affirmative duties absent the existence of some special relationship, be it contractual or otherwise. *Elias v. Lancaster Gen. Hosp.,* 710 A.2d 65, 68 (Pa.Super.1998). However, "[w]here the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all per-

sons not to place others at risk of harm through their actions." *Roche v. Ugly Duckling Car Sales, Inc.,* 879 A.2d 785, 789 (Pa.Super.2005).

Pennsylvania courts are reluctant to subject a person to liability to a third party in the absence of compelling circumstances. *F.D.P. ex rel S.M.P. v. Ferrara,* 804 A.2d 1221, 1230 (Pa.Super.2002). In *DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990), our Pennsylvania Supreme Court held that a physician may be liable to a third party who is injured because of the physician's negligent treatment of a patient. In *DiMarco,* a patient was infected with hepatitis B. *Id.* at 423. The patient's physician erroneously told her that if she remained symptom free, she would no longer be infectious in six weeks. *Id.* The physician further advised the patient to refrain from sexual intercourse for six weeks. *Id.* The patient heeded this advice; she waited eight weeks before engaging in sexual intercourse. *Id.* Her partner became infected with hepatitis B, and sought to hold the physician liable. *Id.*

Applying Section 324A of the Restatement (Second) of Torts,[3] our Supreme Court focused upon foreseeability as a factor in determining whether to impose a duty upon the physician to a third party:

In *Cantwell v. Allegheny County,* 506 Pa. 35, 41, 483 A.2d 1350, 1353–54 (1984), this Court stated:

In order to state a cause of action under § 324A, a complaint must con-

---

**3.** Section 324A provides as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

tain factual allegations sufficient to establish the legal requirement that the defendant has undertaken "to render services to another which he should recognize as necessary for the protection of a third person".... This is essentially a requirement of foreseeability.

When a physician treats a patient who has been exposed to or who has contracted a communicable and/or contagious disease, it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease. Communicable diseases are so named because they are readily spread from person to person. Physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others. The patient must be advised to take certain sanitary measures, or to remain quarantined for a period of time, or to practice sexual abstinence or what is commonly referred to as "safe sex."

Such precautions are taken not to protect the health of the patient, whose well-being has already been compromised, rather such precautions are taken to safeguard the health of others. Thus, the duty of a physician in such circumstances extends to those "within the foreseeable orbit of risk of harm." If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person

*DiMarco*, 583 A.2d at 424–25 (citation omitted). Thus, the Supreme Court concluded that a physician's duty encompassed third parties, whose health could be threatened by contact with the diseased patient. In so holding, the Supreme Court extended the duty of the physician to those within the foreseeable orbit of the risk of harm. *Id.* at 425.

Pennsylvania Courts, to date, have applied Section 324A to impose a duty upon physicians to third parties only in cases involving communicable diseases. For example, in *Estate of Witthoeft*, the Pennsylvania Supreme Court held that an ophthalmologist was not liable to victims of an accident allegedly caused by a patient's poor vision. *Estate of Witthoeft*, 733 A.2d at 630. In distinguishing *DiMarco*, the Supreme Court stated,

> [i]t may be reasonably foreseeable that a patient exposed to an infectious and communicable disease will injure a third party unless properly informed to prevent the spread of the disease. However, we believe that it is an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a physician liable to the public at large within the factual scenario of this case. This is especially true where, as here, [the ophthalmologist] did not cause or aggravate a medical condition that affected the patient's driving and the patient was necessarily aware of her medical condition.

> Appellant's decedent is simply not a foreseeable victim that this court will recognize. We will not stretch foreseeability beyond the point of recognition for to do so will be to make liability endless. To allow liability in this case would be to make physicians absolutely liable for the various acts of their pa-

tients. This we will not countenance....

*Id.; accord Hospodar v. Schick,* 885 A.2d 986, 990 (Pa.Super.2005) (holding that a neurologist was not liable to the victims of an accident caused by a patient's epileptic seizure). Thus, in *Estate of Witthoeft,* the Pennsylvania Supreme Court refused to extend a physician's duty to unidentified and unknown third persons or the public at large, especially where the physician did not cause or aggravate the underlying medical condition.

Here, we are not asked to extend Defendants' duty to the public at large. Rather, we are asked to apply Section 324A to impose a duty upon Defendants to a readily foreseeable, third-party beneficiary of the physician-patient relationship. The record, viewed in a light most favorable to Plaintiffs, discloses that blood work obtained during Mother's 1997 pregnancy disclosed that she is Rh-negative. Defendants' Motion for Summary Judgment at ¶ 7. Blood work obtained from Father in 1997 disclosed that Father is Rh-positive. *Id.* at ¶ 8. After the delivery of S.M., in 1997, Mother was administered RhoGAM. *Id.* at ¶ 9.

Mother came under the care of Defendants during her second pregnancy in 1998. *Id.* at ¶ 11. During this pregnancy, Mother was again found to be Rh-negative. *Id.* at ¶ 12. Defendants knew that the administration of RhoGAM to Mother could protect the future, unborn children of Mother and Father. *See id.* at ¶ 17 (wherein Defendants admitted to not having administered RhoGAM to Mother and advising Mother regarding the effects of Mother's Rh-sensitization upon an unborn fetus, including but not limited to hydrops). There is no evidence of record that the administration of RhoGAM would provide any medical benefit or harm to Mother, personally.

Thus, the evidence, viewed in a light most favorable to Plaintiffs, reflects that Child was in a class of persons whose health/life was likely to be threatened by Defendants' failure to administer RhoGAM to Mother in 1998. Further, it was reasonably foreseeable that Defendants' failure to administer RhoGAM to Mother in 1998 could injure her future unborn children. Finally, the purpose for administering RhoGAM is to protect the future unborn children of Mother and Father. Under these particular circumstances, the first and third factors weigh in favor of finding a duty owed by Defendants to Child.

The social utility of imposing a duty upon Defendants to protect against death or injuries to future children, by timely administration of RhoGAM, is readily apparent and supported in the record. *See* Defendants' Motion for Summary Judgment at ¶ 17 (referring to Mother's Discharge Summary, setting forth Dr. Muir's advice to Mother regarding the effects of Rh-sensitization upon an unborn fetus). Thus, this factor weighs in favor of recognizing a duty owed by Defendants to Plaintiffs.

Regarding the fourth factor and fifth factors, we recognize that the consequences of imposing a duty upon physicians under these circumstances could subject physicians to liability years and possibly even decades. However, we also consider, as a consequence of imposing such a duty, the prevention of injury or death resulting from Rh-sensitization.

Further, as a public policy, the Commonwealth of Pennsylvania is concerned with protecting public health. In fact, in the Medical Care Availability and Reduction of Error Act, the General Assembly declared it to be the policy of the Commonwealth that "[e]very effort must be made to reduce and eliminate medical er-

rors by identifying problems and implementing solutions that promote patient safety" and that "[a] person who has sustained injury or death as a result of medical negligence by a health care provider must be afforded a prompt determination and fair compensation." 40 P.S. § 1303.102(4)-(5). Here, Plaintiffs allege that Child sustained an injury/death as a result of negligence of Defendants. Recognition of a duty, under the circumstances of this case, advances the public policies of this Commonwealth.

In summary, the five factors set forth in *R.W.* weigh in favor of recognizing a duty under the circumstances presented in this case. On this basis, we agree with the trial court's conclusion that Plaintiffs should be permitted to move forward with their action. *See* Trial Court Opinion, 2/20/09, at 20.

In their third claim of error, Defendants argue that the trial court improperly failed to enter summary judgment in their favor, based upon the assumption of a known risk by Plaintiffs. Brief for Appellants at 29. According to Defendants, Dr. Muir explained the ramifications of not receiving RhoGAM to Plaintiffs and Plaintiffs understood these ramifications. *Id.* at 30. At this point, Defendants contend, Dr. Muir could not prevent any further harm. *Id.* Defendants assert that, notwithstanding these known ramifications, Plaintiffs "chose the most terrible danger of all, bringing into life a human being who had little chance of living, and if so, could go through whatever life it had deformed and maimed." *Id.*

Similarly, Defendants also assert the doctrine of *volenti non fit injuria, i.e.,* "rational people with full knowledge of the hazards entailed who choose to engage in [a] dangerous undertaking must assume personal responsibility therefore." *Id.* at 31 (citing *Zachardy v. Geneva College,* 733 A.2d 648 (Pa.Super.1999)). Defendants argue that if the doctrine is not applied, their accountability will be unlimited, "and [Plaintiffs] assume no personal responsibility." Brief for Appellants at 31.

We acknowledge the continuing vitality of the assumption of risk doctrine remains in doubt.[4] *Zeidman v. Fisher,* 980 A.2d 637, 640 (Pa.Super.2009); *see also Montagazzi,* 994 A.2d at 635 (recognizing that the assumption of the risk operates merely as a corollary of the absence of a duty). Regardless, "the question of assumption of the risk typically remains for the jury." *Montagazzi,* 994 A.2d at 636. "Only where the evidence reveals a scenario so clear as to void all questions of material fact concerning the plaintiff's own conduct can the court enter summary judgment; in effect the court determines that the plaintiff relieved the defendant of the duty to guard him from a risk of harm regardless of the source from which the duty derived." *Id.*

In denying Defendants' Motion for summary judgment, the trial court provided a cogent analysis this issue:

> Before it [c]an be submitted to a jury, all the elements of the defense of assumption of risk must be demonstrated: that the plaintiff fully understood the specific risk and voluntarily chose to encounter it under circumstances that manifest a willingness to accept it. The latter of these is admittedly a particularly difficult element of the defense. A summary judgment motion requires [the

---

4. The doctrine of assumption of the risk was largely replaced in this Commonwealth by a system of recovery based on comparative fault, embodied in the Comparative Negligence Act, 42 Pa.C.S.A. § 7102(a)-(b). *Chepkevich v. Hidden Valley Resort, L.P.,* 2 A.3d 1174, 1176 (Pa.2010).

court] to determine whether any genuine issue of material fact exists as to a necessary element of the cause of action or defense. We cannot conclude, in light of the obligation imposed on us by the summary judgment standard of review[,] that there is no genuine issue of material fact. We do not know whether Plaintiffs fully understood the risk. Nor can we agree with Defendants that Plaintiffs' assumption of the risk should somehow be imputed to [Child]. How can [the court] say that [Child] "assumed the risk" by being conceived? [The court] is compelled, therefore, to deny the Motion for Summary Judgment based on the assumption of the risk.

Trial Court Opinion, 2/20/09, at 22. We agree with the sound reasoning of the trial court, as set forth above, and affirm on this basis.

Order affirmed.