J-A27011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BIG BITE REAL ESTATE, LLC, BOTH INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF ILERA HOLDINGS, LLC, AND SHANNON HEXTER | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| ILERA HOLDINGS, LLC, GREG ROCHLIN, ZOLTAN KEREKES, TORSTEN GEERS, OSAGIE IMASOGIE, LISA GRAY, ILERA HOLDINGS II, ILERA HEALTHCARE, LLC, AND IHC REAL ESTATE | : : : : : : : : : | |
| APPEAL OF: ILERA HOLDINGS, LLC, GREG ROCHLIN, ZOLTAN KEREKES, TORSTEN GEERS, OSAGIE IMASOGIE, LISA GRAY, AND ILERA HOLDINGS II | : : : : | No. 2906 EDA 2024 |

Appeal from the Judgment Entered October 31, 2024
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 201000441

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.: **FILED APRIL 8, 2026**

Ilera Holdings, LLC, Greg Rochlin, Zoltan Kerekes, Torsten Geers, Osagie Imasogie, Lisa Gray, and Ilera Holdings II, LLC (collectively "Defendants"), appeal from the judgment entered against them and in favor of Big Bite Real Estate, LLC, both individually and derivatively on behalf of Ilera Holdings, LLC, and Shannon Hexter (collectively "Plaintiffs").[1] We vacate

_____

[1] All the business entities involved in this case are limited liability companies ("LLCs").

the judgment and the verdict, reverse the order granting Plaintiffs' request for fees and costs, and remand with instructions.

This case presents a complex web of similarly-named companies, owned and controlled by varying combinations of the above-named individuals along with non-parties, involved in the cultivation and sale of medical marijuana.[2] Frustratingly, neither the litigants nor the trial court consistently reference the distinct parties and entities with precision, leaving this Court with oftentimes confusing and unclear arguments and findings. We offer the following statement of the case, gleaned to the best of our ability from the certified record and from Plaintiffs' proposed findings of fact and conclusions of law, which the trial court adopted in rendering its verdict, insofar as those findings are supported by the evidence.

We begin our narrative in 2015, when Hexter formed Chesapeake Health Sciences ("CHS") to pursue medical marijuana licenses in Maryland. While Hexter had an MBA, her education and experience was in science. She thus hired a consultant to create CHS's financial models, deeming herself unqualified to do such valuations. However, Hexter undertook the task of learning about and completing the arduous process of applying for a cannabis license. Hexter searched for someone to run the company and found Rochlin,

_____

[2] We shall refer to the individuals among the appellants, namely Rochlin, Kerekes, Geers, Imasogie, and Gray, as the "Individual Defendants."

an experienced business executive. Rochlin bought into CHS and became its CEO.

Meanwhile, Gray, Imasogie, Kerekes, and Geers were considering the pursuit of cannabis licenses in Pennsylvania. Gray was a certified public accountant and certified valuation analyst. Imasogie, Kerekes, and Geers were attorneys with knowledge of the pharmaceutical industry or corporate governance. All four had extensive experience in private equity.

In the summer of 2016, the parties began discussions about combining their efforts to pursue licenses in both states. In October 2016, these talks culminated in the formation of Ilera Holdings ("Ilera I"), a Pennsylvania LLC, with Hexter and Rochlin contributing their interest in CHS to the capitalization. The parties created Ilera Healthcare, LLC ("Healthcare") as the operating company to apply for the Pennsylvania licenses. When CHS failed to acquire a Maryland cultivation license, the Ilera I operating agreement was amended to reflect that Rochlin contributed $150,000 in cash, the same as the other members aside from Hexter. Hexter, who lacked liquidity due to her acquisition of real estate in Fulton County, instead was credited for leasing that property to Ilera I with a right to purchase at a $102,273 discount. The property was held by Big Bite Real Estate, LLC ("Big Bite"), of which Hexter

was the sole member. Ilera I's lease of Big Bite's property was assigned to Healthcare for its use should it be awarded a Pennsylvania cultivation license.[3]

As of March 7, 2017, the Individual Defendants each held 17.6% of the company's common units and Big Bite held the remaining 12%. *See* Trial Exhibit # 22 at Scheule I. Article VI of the operating agreement, detailing the management of Ilera I, provided that it was to be governed by a board of five managers, initially the five Individual Defendants. *Id*. at §§ 6.1, 6.3. General provisions in Article XIV of the operating agreement included the stipulation that Ilera I's assets were wholly owned by the company, with no member having any ownership in them or any portion thereof. *Id*. at § 14.2. The agreement was governed by Pennsylvania law, with each party waiving the right to a jury trial in connection with it. *Id*. at § 14.8. Should an action be brought to enforce or interpret the agreement, to protect rights granted by it, or to cover damages for its breach, a party prevailing in whole or in part would be entitled to costs and reasonable attorney fees. *Id*. at § 14.16. Significant to this appeal, § 6.8 of the operating agreement stipulated that no member

_____

[3] The Individual Defendants also expected Hexter as "the lead expert on the application preparations," to save Ilera I the expense of hiring a consultant. *See* Trial Exhibit # 26 at 2. However, since Hexter became so exhausted from completing a prior application that she "seriously almost died," she did not make that contribution and Ilera I hired a third party to perform that work "for significant cost[.]" *Id*. at 1, 3.

had any fiduciary duty to the company or other members regarding other investment opportunities.[4]  *Id*. at § 6.8(a).

In June 2017, Healthcare was awarded Pennsylvania cultivation and dispensary licenses, allowing for a vertically-integrated operation.  Rochlin served as Healthcare's CEO, Gray was its CFO, and the COO was non-member Oludare Odumosu.   Healthcare entered into an agreement with Playa Financial, LLC ("Playa"), operated by Rochlin's friend Myles Norin, for a $10 million line of credit ("LOC"), with interest on drawdowns payable quarterly. In exchange, Playa was granted 15% equity in Healthcare, with Ilera I retaining the other 85%.  Healthcare constructed a cultivation facility on the land leased to Ilera I by Big Bite, with operations beginning in January 2018.

In the meantime, Healthcare COO Odumosu introduced the Individual Defendants to Dr. Chandra Macias, a major force in the cannabis industry. The Individual Defendants and Norin discussed developing a relationship with her to pursue opportunities in other states.  They partnered with her group to seek licenses in Ohio and Connecticut, utilizing Healthcare's resources to cover some expenses although Healthcare was not a participant.

In May 2018, Gray reflected that, given the use of "Healthcare's cash flow to fund other opportunities," they did "need to" include the other Ilera I

---

[4] Healthcare's operating agreement was identical to that of Ilera I as to the sections detailed above, excepting that Schedule I of the Healthcare document provided that Ilera I was the sole member.  *See* Trial Exhibit # 18.

investors "in the overall strategy." Trial Exhibit # 83 at 1. Gray suggested to Rochlin that they communicate with Hexter "to see if she would take a lower position to have broader opportunity," which in turn "would maximize our flexibility in terms of funding allocation to projects/working capital and simplify our structure." *Id*. However, they elected not to have that discussion with Hexter at that time because they had nothing to offer in exchange for her equity reduction in Ilera I. *See* N.T. Trial, 7/9/24, at 99-100.

The Individual Defendants took steps toward their expansion strategy that summer. In July 2018, they increased Healthcare's LOC from Playa to $20 million, with $5 million earmarked for expansion. The next month, they used $20,000 from the LOC to apply for New Jersey licensure to be granted to Ilera Holistic Healthcare ("IHH"), listing Hexter as an equity holder in IHH in order to support it with Healthcare's operations.[5] *Id*. at 216-17.

The agenda for Healthcare's September 26, 2018 board meeting included the pursuit of licenses in New Jersey, Ohio, Connecticut, Maryland, and the District of Columbia, with pro forma capitalization tables reflecting the participation of Ilera I and Hexter in each. They instead decided to deem Ilera I and Healthcare as Pennsylvania-specific entities, and separately "determine

---

[5] IHH's New Jersey application was ultimately unsuccessful.

the appropriate investor group" for other opportunities that came to them.[6] *Id*. at 60.

Accordingly, the following day Gray sent Rochlin updated capitalization tables showing Ilera Holdings II, LLC ("Ilera II") to be formed with the Individual Defendants each owning 16.17% and the rest held in varying percentages by Healthcare COO Odumosu and companies controlled by Playa owner Norin and his associate. *See* Trial Exhibit # 98 at 8. Pro formas for potential entities created to operate in the other jurisdictions proposed splitting ownership of each between Ilera II and Dr. Macias's group. *Id*. at 9-12. Gray suggested that, if they accepted any of the new licenses, they should then form Ilera II; reimburse Healthcare for the expenses it covered for New Jersey, Connecticut, and Ohio; split Healthcare's LOC between it and the other state's operating company; and establish a services agreement whereby Healthcare would charge the other entities for the management services it provided. *Id*. at 1.

In late October 2018, Dr. Macias approached Rochlin with a new, time-sensitive opportunity to acquire an existing license in Louisiana. Specifically, Advanced Biomedics ("AB") had a contract with Southern University

---

[6] As later testimony revealed, Kerekes and Geer deemed Hexter to be an undesirable partner for future ventures since she had neither capital nor business acumen to offer, and she did not contribute as expected by completing the company's license applications. *See* N.T. Trial, 7/11/24, at 107-10, 133.

("Southern"), which held one of only two licenses for marijuana cultivation and processing in the state. Southern was prepared to terminate the arrangement with AB, which had yet to begin cultivation, because it was behind in payments. *See* N.T. Trial, 7/9/24, at 76-80. Dr. Macias proposed teaming up to acquire a controlling interest in AB and its valuable contract with Southern.

The Individual Defendants promptly met with Norin to discuss the proposal and opted to move forward with it. Given the time constraints, they utilized an existing entity to submit a November 1, 2018 letter of commitment to buy AB, namely IHH, the company of which Hexter was a member and that had unsuccessfully sought New Jersey licensure. The following day, Gray emailed Rochlin a list of actions necessary for the AB acquisition, such as formally establishing Ilera II, setting up a management company and its service agreements with Healthcare and AB, and having Healthcare borrow funds on its LOC to be given to Ilera II "as a loan to be paid back our [*sic*] of an equity raise." Trial Exhibit # 113.

On November 6, 2018, Gray made a written request to Playa for a $2.35 million drawdown from Healthcare's LOC, which Playa approved and added to Healthcare's debt. The next day, Ilera II was founded and its operating agreement executed, with the Individual Defendants making no capital contributions for their equal 16.7% interests therein. The AB transaction closed on November 9, 2018. On November 14, 2018, the Individual

Defendants sent Southern a letter clarifying that AB was being acquired by Ilera II, rather than IHH as indicated on the letter of commitment, and subsequently reimbursed Healthcare by paying back the LOC.

This was all undertaken without informing Hexter of the Louisiana opportunity or offering her the chance to participate therein. Rather, after the transactions were completed, Rochlin set up a meeting with Hexter at the office of David Sellman, Esquire, on December 8, 2018. Not disclosing how the Individual Defendants learned about AB or paid to acquire it, Rochlin offered Hexter the chance to buy a 4% stake on Ilera II by reducing Big Bite's equity in Ilera I from 12% to 4%. Hexter maintained that she already held an interest in the entities involved in the Louisiana acquisition by virtue of her membership in Ilera I, but Rochlin was adamant that she was not entitled to any portion of Ilera II unless she agreed to the proposed equity swap. If she wished to make the swap, Hexter had to decide before year's end. *See* N.T. Trial, 7/8/24, at 35.

While Hexter contemplated the offer, Healthcare held its December 2018 board meeting, which included a discussion of numbers and a timeline for an expansion to begin in January 2019. *See* Trial Exhibit # 130. The following week, Gray circulated materials to attract investment in IHH. The investor presentation highlighted Healthcare's Pennsylvania facilities. *See* Trial Exhibit # 138 at 19-20, 23-25. Supporting documents stated a $232 million valuation of Healthcare as a result of the expansion. *See* Trial Exhibit # 140 at 2.

This material was not provided to Hexter, who was unaware of the plans to expand Healthcare's Pennsylvania operations. Instead, at Hexter's request, Gray prepared a spreadsheet depicting "the expectations on value and impact of the share shift" in the event that Hexter decided to move forward with the proposal Rochlin made at Attorney Sellman's office ("the share transfer analysis"). **See** Trial Exhibit # 146. Although Gray emailed this to Hexter on December 20, 2018, which was the day after sending the IHH investor documents showing Healthcare being worth $232 million, Gray provided Hexter a Healthcare net value of only $59 million. **Id**. On the other hand, she represented the worth of Ilera II's Louisiana and District of Columbia operations at $300 million and $64 million, respectively. **Id**. Thus, Gray's calculations indicated that Hexter stood to increase the overall value of her investment by 57% if Big Bite accepted the equity swap.

Relying upon Gray's valuations in the share transfer analysis, Hexter agreed to the proposal despite her belief that she should not have had to give up anything to own a piece of Ilera II. Between December 31, 2018, and January 18, 2019, the parties executed multiple documents in connection with the equity swap. First, there was a Redemption Agreement, governed by Delaware law, by which Big Bite reduced its interest in Ilera I from 12% to 4%. **See** Trial Exhibit # 191. In conjunction with this, the Ilera I's operating agreement, which was governed by Pennsylvania law, was amended to reflect the changes effectuated by the Redemption Agreement. **See** Trial Exhibit

# 193.  Correspondingly, a subscription and joinder agreement gave Big Bite a 4% interest in Ilera II, and its operating agreement, governed by Delaware law, was amended to, *inter alia*, reflect Big Bite's joinder.  **See** Trial Exhibits # 194 and # 195.

Additionally, Hexter, through Attorney Sellman, secured a side letter agreement which guaranteed Big Bite that its proportionate interest in Ilera I and Ilera II would not change moving forward, and that it would have the same proportionate interest in any new Ilera-related projects involving three or more members of those companies.  **See** Trial Exhibit # 200 at 4.  Pursuant to the side agreement, Hexter was subsequently invited to participate in other companies in Georgia, Maryland, and Louisiana.  **See** N.T. Trial, 7/8/24, at 118.

In April 2019, Rochlin received an offer from TerrAscend Corp. ("TerrAscend") to purchase Healthcare.  Rochlin rejected that offer and several others, deeming them insufficient to account for Healthcare's future revenues, before ultimately reaching an agreement with TerrAscend on August 1, 2019. All told, TerrAscend paid $225 million for Healthcare, $200 million of which was cash.  As a result of the equity swap, Big Bite realized a fraction of what it would have received from the sale of Healthcare, while each of the Individual Defendants pocketed millions more.

Plaintiffs initiated the instant action in October 2020, raising claims by Big Bite, both individually and derivatively on behalf of Ilera I, and by Hexter. Specifically, the operative complaint stated the following counts:

(I) Big Bite, derivatively on behalf of Ilera I vs. the Individual Defendants - breach of fiduciary duty;

(II) Big Bite vs. the Individual Defendants - breach of the covenant of good faith and fair dealing;

(III) Big Bite vs. the Individual Defendants - fraud;

(IV) Big Bite vs. Ilera I, Healthcare, and another Ilera-related entity not mentioned above - declaratory judgment;

(V) Big Bite vs. the Individual Defendants and Ilera II - civil conspiracy;

(VI) Big Bite vs. the Individual Defendants - unjust enrichment;

(VII) Big Bite vs. the Individual Defendants and Ilera I - accounting;

(VIII) Hexter vs. Rochlin - conversion;

(IX) Big Bite vs. Ilera II - tortious interference with contract; and

(X) Big Bite vs. the Individual Defendants - constructive trust.

*See* First Amended Complaint, 11/9/20, at 21-29.

For one reason or another, counts II, IV, VII, VIII, and IX were dismissed before the case was tried in July 2024. As such, the trial involved no claim by Hexter on her own behalf. Rather, the court was tasked with deciding Ilera I's claim, brought derivatively by Big Bite, for breach of fiduciary duty, as well as Big Bite's individual claims for fraud, civil conspiracy, unjust enrichment, and constructive trust.

Specifically, the derivative claim brought on behalf of Ilera I asserted that the Individual Defendants breached their fiduciary duty "to refrain from competing with Ilera I in the conduct of Ilera I's activities and affairs." *Id*. at ¶ 115. The complaint continued: "By transferring the acquisition of [AB], as well as other valuable intellectual property and assets belonging to Ilera I, to Ilera II (which had only been formed five days before the [AB] acquisition was announced), the Individual Defendants took assets and an opportunity that belonged to Ilera I and began to compete against Ilera I." *Id*. at ¶ 118. As a result of this alleged breach, "Ilera I [was] damaged in an amount to be determined at trial, but in no event less than $2.15 million." *Id*. at ¶ 121.

Turning to Big Bite's direct claims, its fraud count was founded upon the statements made to induce it to agree to the equity swap, and asserted as damages "the fraudulent reduction of its membership interest in Ilera I from 12% to approximately 4%, and its corresponding loss of the additional 8% of profits Big Bite would have been entitled to from the TerrAscend Deal but for the fraud." *Id*. at ¶ 136. The conspiracy claim stated that the Individual Defendants "combined and agreed to act for the common purpose of intentionally excluding Big Bite from the enterprise of Ilera I[.]" *Id*. at ¶ 146. As a result, Big Bite purportedly "suffered damages including the lost profits stemming from the sale of Healthcare to TerrAscend." *Id*. at ¶ 147. Big Bite's unjust enrichment count asserted that "[a] benefit was conferred on the Individual Defendants as a product of their illicit actions to exclude Big Bite

from business opportunities rightfully belonging to Ilera I and inducing Big Bite into decreasing its equity." *Id*. at ¶ 150. It claimed that it would be unjust to allow them to retain "(i) ownership of 8% interest in Ilera I that rightfully belongs to Big Bite, and (ii) at least $ 18 million in profit from the TerrAscend Deal that would have gone to Big Bite had it not been fraudulently induced into diluting its equity." *Id*. at ¶ 151. Thus, at bottom, Big Bite's individual claims all sought to recover the amount that went to the Individual Defendants instead of Big Bite by virtue of the Redemption Agreement when Healthcare was sold to TerrAscend.

Bit Bite attempted to establish the factual underpinnings of these causes of action at trial through the testimony of Hexter, the Individual Defendants, and Norin, along with scores of exhibits, including deposition testimony from Attorney Sellman. The court also heard opinion testimony from Lincoln Eckhardt, Plaintiffs' expert in valuation and economic damages. In Eckhardt's learned estimation, Gray had grossly undervalued Healthcare and overvalued AB in providing Hexter the share transfer analysis that prompted her to agree to the equity swap.

Specifically, with the planned expansion of Healthcare, Mr. Eckhardt assigned it a net value of $179.3 million as opposed to Gray's $59 million. *See* N.T. Trial, 7/10/24, at 55. On the other hand, he deemed Gray's assessment of AB with a value of $300 million to have "made no sense" at the time it was rendered, because at the beginning of 2019, Louisiana had "a very

restrictive, very narrow market." **Id**. at 64. Although Louisiana law changed significantly between the time of the swap and trial, in Mr. Eckhardt's opinion, there was "no way that management could understand the future regulatory changes that were going to fundamentally restructure the marketplace," and made "no assessment of the true market in Louisiana" as it was when Gray provided the valuation to Hexter. **Id**. at 97. In his view, the value of AB at the time of the swap was only $33.6 million. **Id**. at 63. Acknowledging that the subsequent change in the marketplace yielded a 2022 AB valuation of $288 million, close to the $300 million Gray had offered Hexter in 2019, Mr. Eckhardt quipped: "I guess sometimes it's better to be lucky than good." **Id**. at 98.

Mr. Eckhardt's testimony as to his damage calculations was rife with instances of conflating Big Bite, Hexter, and Ilera I. He first explained his calculations as to Big Bite's fraud claim as having the goal "to put the plaintiff back in the position **she** would have been in just prior to the transaction," such that he "valued each of the companies that were contained within the transaction and then determined plaintiff's effective ownership interest in each of those companies."[7] N.T. Trial, 7/10/24, at 55 (emphasis added). All told,

_____

[7] Plaintiffs' proposed findings and conclusions stated an altered version of this testimony as follows: "To calculate the damages based on the Individual Defendants' fraud in the inducement, Mr. Eckhardt used the Individual Defendants' own DCF analysis to 'put the [Plaintiffs] back in the position [they] would have been in just prior to the transaction [*i.e.*, the Equity Swap].'"
*(Footnote Continued Next Page)*

Mr. Eckhardt opined that Big Bite's interest in Ilera I entities went from a value of $20.2 million to roughly $8 million as a result of the swap. *Id*. at 61-63. Meanwhile, its 4% acquisition of Ilera II was, at the time, only worth $1.1 million. Thus, Big Bite lost $11,062,949, or more than 54%, by agreeing to the swap, rather than gaining 57% as Gray indicated in the share transfer analysis.

Mr. Eckhardt also testified about the fiduciary duty damages. Although this claim was brought on behalf of Ilera I, he again used "she" in speaking of the plaintiff whose losses he calculated. *See*, *e.g.*, *id*. at 72. Explaining his understanding of the claim, Mr. Eckhardt stated:

> [T]he assets of Ilera II really flowed from Ilera I and, therefore, the plaintiff should have been brought along into Ilera II, so this analysis looks like if her *pro rata* interest in Ilera I, which is 12[%], was applied to Ilera II, she would have a 12[%] in both entities.

*Id*. at 72.

While the fraud damages were ascertained as of the time of the equity swap in December 2018, the valuations pertinent to his fiduciary duty opinion were assessed as of December 2021, when he wrote his report. *Id*. at 71. Now embracing, *inter alia*, a $288.3 million value for AB and a $200.8 million value for Healthcare, Mr. Eckhardt concluded as follows: "If plaintiffs had the

---

Plaintiffs' Proposed Findings, 8/22/24, at ¶ 172 (alterations in original). The trial court repeats this modification of Mr. Eckhardt's actual testimony in its Rule 1925(a) opinion. *See* Trial Court Opinion, at 18. Yet, as noted, the one claim brought by Hexter directly was dismissed prior to trial.

12[%] ownership interest in Ilera I and Ilera II, they would have value today of approximately $49 million, what they actually received was about $14.5 million, so the damage to the plaintiff under this analysis is $24.5 million."[8] *Id*. at 80-81.

On cross-examination, Mr. Eckhardt made it plain that he did not view Ilera I as being a plaintiff advancing the fiduciary duty claim and stated no opinion as to Ilera I's damages:

Q       So Count 1 is a derivative claim on behalf of Ilera I, correct?

A       That's what it says.

Q       And you did not calculate any damages regarding the derivative claim of Ilera [I], correct?

A       Not in this chart.  I calculated damage to the plaintiff.

Q       Not only not in this chart, nowhere in your report, correct?

A       No.

Q       The answer to my question is, yes, you did not calculate those damages to Ilera [I], correct?

A       That's correct.

*Id*. at 85.  On re-direct, counsel tried to elicit a number from Mr. Eckhardt that the trial court could use to calculate Ilera I's damages, but the court sustained Defendants' objection to that opinion being beyond the scope of his report.  *Id*. at 111-12.

---

[8] More precisely, Mr. Eckhardt calculated the fiduciary duty loss to be $24,515,407.  *See* Plaintiffs' Proposed Findings, 8/22/24, at ¶ 197.

After the trial concluded, the parties filed proposed findings of fact and conclusions of law. The court subsequently rendered its verdict by entering the following order:

> AND NOW, this 6th day of September, 2024, upon consideration of all evidence presented at trial, along with the findings of facts and conclusions of law submitted by all parties, it is hereby ORDERED and DECREED as follows:
>
> 1. Judgement [*sic*] is entered in favor of Plaintiffs and against all Defendants in the amount of $24,515,407 together with prejudgment interest, plus attorneys' fees and costs.
>
> 2. Plaintiffs' claim for punitive damages is DENIED.
>
> 3. The [c]ourt fully adopts the finding of facts and conclusions of law submitted by Plaintiffs.[9]

Order, 9/6/24 (emphases omitted). The court further directed Plaintiffs to file a fee petition, indicating that a hearing thereupon would be scheduled if necessary. ***Id***.

Defendants filed a timely post-trial motion seeking relief based upon, *inter alia*, the issues they present in this appeal. The trial court summarily denied Defendants' motion without a hearing on October 1, 2024.

---

[9] Plaintiffs' complaint contained a count for constructive trust, and their proposed findings mentioned it as a potential remedy for the breach of fiduciary duty claim, suggesting that the court "order that the Individual Defendants place . . . Hexter's [twelve] percent interest in all of the assets improperly diverted into Ilera [II] into a constructive trust." Plaintiffs' Proposed Findings, 8/22/24, at 53 n.19. The court explained in its Pa.R.A.P. 1925(a) opinion that, by declining to order constructive trust in its verdict order, it effectively denied that claim *sub silentio*. ***See*** Trial Court Opinion, 3/4/25, at 12-13. Hence, we perceive the court's order to have resolved all outstanding claims.

- 18 -

Meanwhile, Plaintiffs filed their motion for fees, citing § 14.16 of Ilera I's amended operating agreement as the legal basis for their entitlement to reasonable attorney fees and costs. They attached an attorney declaration of the reasonableness of the rates and the propriety of the work, along with hundreds of pages of invoices reflecting the names of the attorneys or paralegals who provided services, the amount of time spent on each task, and the corresponding amount billed. However, the descriptions for the services were wholly redacted such that it was impossible to ascertain the basis for any given charge. Overall, Plaintiffs asked for $1,965,787.40. Apparently deeming a hearing unnecessary, the court by order of October 28, 2024, granted Plaintiffs' motion, awarding the full amount of requested fees and costs to be paid by the Individual Defendants. Based upon that award, the verdict, and pre-judgment interest, judgment was entered in favor of "Plaintiffs" and against the Individual Defendants, jointly and severally, in the amount of $32,242,314.04.

This timely appeal followed.[10] The trial court ordered Defendants to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. They timely

_____

[10] More precisely, this appeal was initiated prematurely on October 29, 2024, when Defendants filed a notice purporting to appeal from the denial of their post-trial motion. They also filed subsequent appeals from the order granting Plaintiffs' fee petition and from the judgment. This Court deemed the instant appeal to have been perfected by, and timely filed from, the subsequent entry of judgment and amended the caption accordingly. *See* Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but

*(Footnote Continued Next Page)*

filed a twelve-page statement reiterating the issues presented in their post-trial motion, and the trial court authored a Rule 1925(a) opinion, suggesting therein that most of Defendants' issues were waived because their statement was vague and not concise. *See* Trial Court Opinion, 4/4/25, at 24-27.

Defendants present the following questions for our resolution:

1. Where the trial court's bench verdict did not address all of the claims at trial, was ambiguous about the parties entitled to relief, and failed to identify the claims on which Defendants were liable or the Defendants who were liable, did Defendants waive their liability arguments by stating non-redundant, non-frivolous issues in their Rule 1925(b) statement?

2. Are the Individual Defendants liable for breach of fiduciary duty where (a) [§] 6.8 of Ilera I's limited liability company agreement permits "[e]ach Member [to] engage in whatever activities such Member may choose, without having or incurring any obligation to offer any interest in such activities to the Company or to the other Members"; and (b) Plaintiffs introduced no evidence of the damages suffered by Ilera I, despite asserting a derivative claim on behalf of the company?

3. Are the Individual Defendants liable for fraud based on estimated projections of future performance, which are not actionable as a matter of law, where reliance on those projections is barred by the parol evidence rule and Plaintiffs did not justifiably rely on alleged omissions regarding a corporate opportunity?

4. Are the Individual Defendants liable for unjust enrichment and civil conspiracy where liability depends on unsupportable fraud and fiduciary-duty findings, the parties' contracts necessarily bar extra-contractual claims, and agents of a single entity cannot conspire as a matter of law?

_____

before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). We dismissed the other two appeals as duplicative of the appeal *sub judice*.

5. Did Plaintiffs establish entitlement to attorneys' fees and costs by submitting wholly redacted attorney invoices and failing to distinguish between fees and costs incurred for successful and unsuccessful claims?

Defendants' brief at 5-6.

We begin with our standard of review:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of the trial court must be given the same weight and effect on appeal as the verdict of a jury. We consider evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary. The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Spolar v. Spolar Family Tr.*, 326 A.3d 995, 1001–02 (Pa.Super. 2024) (cleaned up).

Interpretation of a contract, such as an LLC operating agreement, is a question of law subject to *de novo*, plenary review. *See Vinculum, Inc. v. Goli Techs., LLC*, 310 A.3d 231, 242 (Pa. 2024) (providing contract interpretation standard of review); *Toth v. Toth*, 324 A.3d 469, 486 (Pa.Super. 2024) (indicating an LLC operating agreement is a contract between members). The following legal tenets pertain to these questions:

[I]f the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. If, however, the contractual terms are ambiguous, then resort to extrinsic evidence to ascertain their

meaning is proper. A contract's terms are considered ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

Further, our review is guided by certain principles, or canons, of contract interpretation. First, the entire contract should be read as a whole to give effect to its true purpose. Second, a contract must be interpreted to give effect to all of its provisions. Thus, our Court will not interpret one provision of a contract in a manner which results in another portion being annulled. Third, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons, such as thwarting the intent of the agreement. And, finally, a party's performance under the terms of a contract is evidence of the meaning of those terms.

*Toth*, 324 A.3d at 486 (cleaned up).

We next review some basic principles concerning the nature and governance of LLCs. First and foremost, we observe that, although it is not apparent from the history of this case detailed above, it is axiomatic that an LLC "is an entity distinct from its member or members." 15 Pa.C.S. § 8818(a). As such, Big Bite and its sole member Hexter are not one in the same, and they should not be referenced interchangeably. Likewise, Healthcare and Ilera I were distinct legal entities both when Healthcare was a wholly-owned subsidiary of Ilera I and after Playa became a member with a 15% ownership interest in exchange for providing the Healthcare LOC. Furthermore, as noted above, pursuant to § 14.2 of the operating agreements of both Ilera I and Healthcare, the assets of each entity belonged to that company alone, with no member having any ownership interest in any portion thereof.

This Court has observed that "[LLCs] are creatures of statute," such that "their members are subject to only those duties that are authorized by statute." ***Retina Associates of Greater Philadelphia, Ltd. v. Retinovitreous Associates, Ltd.***, 176 A.3d 263, 271 (Pa.Super. 2017). Among those duties are the standards of conduct for managers of manager-managed LLCs described in the Pennsylvania Uniform Limited Liability Company Act of 2016 ("the Act").[11]  By statutory default, managers in such LLCs have a fiduciary duty of loyalty which includes the following responsibilities:

> (1) to account to the company and to hold as trustee for it any property, profit or benefit derived by the manager:
>
>> (i) in the conduct or winding up of the company's activities and affairs;
>>
>> (ii) from a use by the manager of the company's property; or
>>
>> (iii) from the appropriation of a company opportunity;
>
> (2) to refrain from dealing with the company in the conduct or winding up of the company's activities and affairs as or on behalf of a person having an interest adverse to the company; and
>
> (3) to refrain from competing with the company in the conduct of the company's activities and affairs until completion of the winding up of the company.

15 Pa.C.S. § 8849.2(b).

_____

[11] Both Ilera I and Healthcare were manager-managed Pennsylvania LLCs.

- 23 -

Thus, relevant to this case, a manager's duty of loyalty implicates respecting both that company property is for company use and that company opportunities belong to the company. The comment to § 8849.2(b)(1)(iii) notes that the term "company opportunity" is not defined in the Act, but references "ample case law" discussing an "interest or reasonable expectancy test" and a "line of business test."[12] 15 Pa.C.S. § 8849.2, Committee Comment—2016. Our Supreme Court broadly defined the company opportunity aspect of the duty of loyalty thusly in the context of corporations:

> [T]here is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; the test of his liability is whether he has unjustly gained enrichment.

*Lutherland, Inc. v. Dahlen*, 53 A.2d 143, 147 (Pa. 1947).

Unlike managers, "a member does not have any duty to a manager-managed [LLC] or to any other member of the company solely by reason of being or acting as a member," except to "discharge the duties and obligations under this title or under the operating agreement and exercise any rights

---

[12] The comment also observes that "[i]n most, if not all, situations, usurping a company opportunity also breaches the duty not to compete." 15 Pa.C.S. § 8849.2, Committee Comment—2016. However, Plaintiffs do not argue that the Individual Defendants improperly competed with Ilera I in violation of their § 8849.2(b)(3) duty.

consistent with the contractual obligation of good faith and fair dealing."[13] 15 Pa.C.S. § 8849.1(d), (i). Hence, neither Hexter nor Big Bite had a duty of loyalty to Ilera I.[14]

The statutory provisions do not provide the final word on the duties of managers and members. For while LLCs owe their legal existence to the Act, an LLC "is as much a creature of contract as of statute." 15 Pa.C.S. § 8815, Committee Comment—2016. In addition to establishing the details about the organization and operation of the company, an LLC's operating agreement may vary some provisions of the Act concerning the fiduciary duties of members and managers. Pertinent to this case, an LLC's operating agreement may, if not manifestly unreasonable, "identify specific types or categories of activities that do not violate the duty of loyalty." 15 Pa.C.S. § 8815(d)(3)(iii). The comment to § 8815 indicates that, "[u]nder [subparagraph (d)(3)(iii)], an operating agreement might provide that . . . the manager may pursue opportunities that otherwise would be company opportunities. Such arrangements are commonplace and permissible." 15 Pa.C.S. § 8815, Committee Comment--2016.

---

[13] For LLCs that are member-managed instead of manager-managed, all members have a duty of loyalty. **See** 15 Pa.C.S. § 8849.1(b)(1)(ii)-(iii), (b)(3).

[14] Hexter thus legitimately participated in applying for licenses in Arkansas, California, Missouri, and Ohio without offering those opportunities to Ilera I, Healthcare, or the Individual Defendants. **See** N.T. Trial, 7/8/24, at 70-72.

When a member of an LLC wishes to enforce her rights and interests in the company, she may bring a direct action against managers or other members if she is able to "plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the [LLC]."  15 Pa.C.S. § 8881(b).  Otherwise, the member must pursue a derivative action to enforce the LLC's rights in accordance with 15 Pa.C.S. § 8882.  As we have said in the context of corporations:

> It is axiomatic that a corporation has a cause of action against its officers and directors for breach of a fiduciary duty.  It is also axiomatic that a shareholder may assert a derivative action on behalf of the corporation where the shareholder has demanded that the corporation assert the right underlying the action and the corporation has refused. . . .  [I]n a derivative action, the corporation is a required party.

*Fitzpatrick v. Shay*, 461 A.2d 243, 246 (Pa.Super. 1983).  Moreover, any benefits of a derivative action "belong to the [LLC] and not to the plaintiff" who filed on behalf of the company.  *See* 15 Pa.C.S. § 8885(a)(1).

Mindful of these principles, we turn to Defendants' appellate arguments.  They first assail the trial court's suggestion that they waived the bulk of the issues raised in their Rule 1925(b) statement.  Rule 1925 provides that a statement "shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."  Pa.R.A.P. 1925(b)(4)(i).  While the statement should not be redundant or provide lengthy explanations, raising a large number of errors will not *ipso facto* result in waiver so long as they are not frivolous and are as concise as

- 26 -

practicable. *See* Pa.R.A.P. 1925(b)(4)(iv). Conversely, filing a general statement will not result in waiver where "the appellant in a civil case cannot readily discern the basis for the judge's decision[.]" *See* Pa.R.A.P. 1925(b)(4)(vi).

As noted above, the trial court here found that the majority of Defendants' claims of error were "not concisely stated and [we]re vague in nature." Trial Court Opinion, 3/4/25, at 24. Defendants counter this by maintaining that "[t]he trial court's decision to adopt wholesale Plaintiffs' ambiguous proposed findings and conclusions, with no further explanation," along with its confusing verdict order that failed to specify to whom and against whom damages were awarded required their lengthy filing in order to preserve their claims. *See* Defendants' brief at 32 (cleaned up).

Following our review of the certified record, we agree with Defendants that their Rule 1925(b) statement was appropriate given the significant ambiguity created by the trial court's decision to enter a general verdict in favor of "Plaintiffs" and against "all Defendants," and the claims at issue in the trial. Even after studying the findings incorporated by reference in the court's order, it is unclear to this Court who is supposed to pay what to whom and why.

Here, the fiduciary duty count of the complaint was not brought by Ilera I member Big Bite directly to enforce its rights regarding the duty of loyalty the Individual Defendants owed to Ilera I. Indeed, since the harm Big Bite

- 27 -

alleged resulted solely from the Individual Defendants' decision to usurp an opportunity that it believed belonged to Ilera I, it appears that a direct claim by Big Bite would have been foreclosed by § 8881(b).[15]  Instead, the claim that the Individual Defendants breached their fiduciary duties was brought by Ilera I member Big Bite on behalf of Ilera I to recover the value of the opportunity that the Individual Defendants diverted away from Ilera I.  Big Bite additionally raised claims of fraudulent inducement, unjust enrichment, and conspiracy in its own right against the Individual Defendants.

The trial court's verdict order does not accurately reflect this state of affairs.  The caption of the order lists the following as plaintiffs:  "Big Bite Real Estate, LLC, both individually and derivatively on behalf of Ilera Holdings, LLC, and Shannon Hexter."  Order, 9/6/24 (capitalization altered).  The captioned defendants are "Ilera Holdings, LLC, et al."  *Id*. (capitalization altered).  Meanwhile, the caption to Plaintiffs' proposed findings identifies as

---

[15] It is worth noting that the facts regarding the fiduciary duty claim largely appear to implicate the Individual Defendants' management of Healthcare, not of Ilera I.  All the evidence proffered by Plaintiffs discussed hereinabove points to the opportunity being brought to Healthcare through Healthcare's COO Odumosu, who was not a member of Ilera I.  It was discussed by the Individual Defendants at Healthcare board meetings and through Healthcare company emails.  At the time of AB's acquisition, through Healthcare resources, Healthcare was no longer a wholly-owned subsidiary of Ilera I.  As such, pursuant to Healthcare's operating agreement discussed above, all the Healthcare assets belonged solely to Healthcare and not in any part to its members, *i.e.*, Ilera I and Playa.  Nonetheless, since Defendants do not invoke this Healthcare-Ilera I distinction as a basis for relief, we do not *sua sponte* consider whether it impacts the propriety of the cause of action or the verdict.

defendants: "Ilera Holdings, LLC, Greg Rochlin, Zoltan Kerekes, Torsten Geers, Osagie Imasogie, Lisa Gray, Ilera Holdings II, LLC, Ilera Healthcare LLC, and IHC Real Estate LP." Plaintiffs' Proposed Findings, 8/22/24, at cover page (capitalization altered). Yet, as of the time of trial, Hexter had no viable claims against any defendant, and no plaintiff had any remaining claims against any Ilera entity.

The Defendants raised these complaints in their post-trial motions, but the court declined to clarify its verdict, instead issuing a blanket denial order. In their praecipe to enter judgment on the verdict, Plaintiffs limited "Defendants" to the Individual Defendants. However, the judgment amount was still in favor of all Plaintiffs despite there being both derivative and direct claims raised by Big Bite, and Hexter having prevailed on no direct claim.

In its Rule 1925(a) opinion, the trial court described Defendants' request to clarify the verdict by assigning the derivative claim award to Ilera I as "bizarre" and "concerning." Trial Court Opinion, 4/4/25, at 11. It first claimed that Ilera I was not a party to the case. *Id*. Then the court insisted that, with the caption to the complaint indicating that the plaintiffs were Big Bite both on behalf of Ilera I and itself, as well as Hexter, Big Bite and Hexter were entitled to recover on the fiduciary duty count because Big Bite and Hexter are the ones who were ultimately harmed, and awarding damages to Ilera I would involve the Individual Defendants largely paying themselves. *Id*. at 11-12.

The trial court is legally incorrect. Big Bite and Hexter's alleged loss as a result of the Individual Defendants' decision to divert the Louisiana opportunity to Ilera II was not direct, but was sustained solely by virtue of the fact that they would not reap the benefits of it through Ilera I. That is why Big Bite alleged the claim derivatively on Ilera I's behalf in accordance with § 8882 of the Act rather than directly pursuant to § 8881(a). As such, Ilera I was not only a party to the litigation, but an indispensable party. **See Fitzpatrick**, 461 A.2d at 246. Further, as we just recounted, the Act mandates that any benefits of a derivative action "**belong to the limited liability company and not to the plaintiff**" who filed on behalf of the company. **See** 15 Pa.C.S. § 8885(a)(1) (emphasis added). Thus, whatever portion of the court's general damages finding was related to the fiduciary duty count should have been specifically awarded to Ilera I. Damages for the other claims should have been awarded to Big Bite. Hexter should not have been awarded anything directly.

Stated plainly, the trial court's method of rendering its verdict created an ambiguous mess that it refused to correct when Defendants raised these issues in their post-trial motions. Under these circumstances, no waiver results from the length of Defendants' Rule 1925(b) statement. **See**, **e.g.**, **Maya v. Johnson & Johnson**, 97 A.3d 1203, 1211 n.4 (Pa.Super. 2014) (declining trial court's invitation to find waiver due to the statement containing

twenty-three paragraphs with numerous sub-issues given the complexity of the case, the voluminous evidence, and the absence of any sign of bad faith).

Having resolved that matter, we turn to Defendants' substantive issues, beginning with their challenge to the finding of liability for breach of fiduciary duty. To prevail on this derivative claim, Big Bite was required to prove that: (1) the Individual Defendants were in a fiduciary relationship with Ilera I; (2) they negligently or intentionally failed to act in good faith to fulfill their fiduciary obligations; and (3) Ilera I suffered an injury caused by their breach of fiduciary duty. *See Snyder v. Crusader Servicing Corp.*, 231 A.3d 20, 31 (Pa.Super. 2020). "No damages may be awarded where the evidence is insufficient for the finder of fact to determine what, if any amount, of damages the plaintiff[, *i.e.*, the company,] suffered." *Id*. at 32. In the context of usurpation of a company opportunity, the measure of damages is the profits that the company lost through being deprived of the opportunity. *See CST, Inc. v. Mark, 520 A.2d 469*, 472 (Pa.Super. 1987); *Hill v. Hill*, 420 A.2d 1078, 1083 (Pa.Super. 1980).

Defendants first assert that the court erred in finding liability against the Individual Defendants on the fiduciary duty claim and awarding damages to any plaintiff because: (1) they had no duty to treat the chance to acquire AB as an Ilera I company opportunity in light of § 6.8 of the operating agreement; and (2) Plaintiffs failed to prove any amount of damages to Ilera I resulting

from the Individual Defendants' use of company assets to acquire AB for Ilera II. *See* Defendants' brief at 33, 37.

The trial court declined to address this issue in its Rule 1925(a) opinion, having deemed it waived. Since the trial court rendered its verdict by adopting Plaintiffs' proposed findings, we look to them to explain the propriety of the ruling. Plaintiffs maintain that § 6.8, by its terms, applies only to members and not to managers, whereas elsewhere the agreement references both members and managers. *See* Plaintiffs' brief at 35 (citing § 7.1).

Plaintiffs contend that, in any event, the chance to join with Dr. Macias and her group in acquiring AB "was not some generic 'investment opportunity'" permissible under § 6.8. *Id*. at 36. Indeed, they claim that it "was not an 'investment opportunity' at all since [the Individual Defendants] did not invest their own money to acquire it." *Id*. at 37. Rather, they assert that it was a "quintessential corporate opportunity in that it was (i) brought to the company by a Healthcare executive, (ii) acquired with company assets (*i.e.*, Healthcare's Amended LOC), (iii) in the same business as Healthcare, and (iv) to be operated by Healthcare's existing management."[16] *Id*. at 37 n.12. Hence, their use of company resources for their own benefit, which the Individual Defendants conceded was not authorized by § 6.8, violated the

_____

[16] This characterization causes us to again ponder how the Individual Defendants' obligations to Ilera I instead of to Healthcare are implicated here.

corporate opportunity doctrine that forbids officers and directors from using their position to obtain a personal benefit.[17]  *Id*. at 34, 37.

Plaintiffs assert that Defendants' "claim that Hexter and Ilera I did not suffer any harm is both a red herring and wrong."  *Id*. at 37.  Quoting *Hill*, 420 A.2d at 1081, Plaintiff maintains that "whether Hexter and Ilera I 'suffered harm' is not 'material' because 'the test of [the fiduciary's] liability is whether he has unjustly gained enrichment.'" Plaintiffs' brief at 37 (edits in original). "Thus, even if the company suffers no harm, there may be liability for breach of fiduciary duty."  *Id*.

Defendants assail this reasoning on several fronts.  First, they maintain that Big Bite failed to prove that the Individual Defendants' choice to pursue AB separately from Ilera I breached any duty owed to the company.  They argue that the plain language of § 6.8 clearly and unambiguously disclaims any fiduciary duty regarding investment opportunities for all members, not just members who are not also managers.  *See* Defendants' brief at 34.  They insist that the trial court's interpretation renders the provision meaningless,

---

[17] To the extent that Plaintiffs advance their argument by citing a 2015 unpublished memorandum decision of this Court, they squarely violated § 65.37 of our internal operating procedures, reference to which is boldly emblazoned atop the cited decision.  That provision states, with exceptions plainly not relevant here:  "An unpublished memorandum decision filed prior to May 2, 2019, **shall not be relied upon or cited by a Court or a party in any other action or proceeding**[.]"  210 Pa. Code § 65.37(B) (emphasis added).  Thus, we will not consider that decision in conducting our review, and the trial court erred insofar as it did so by adopting Plaintiff's conclusions of law as its own.

since non-member managers have no fiduciary duty to refrain from usurping company opportunities. *Id*.

Second, the Individual Defendants contend that Big Bite failed to prove the damages element of the derivative claim. Concerning the taking of Ilera I's opportunity to acquire a share of AB, Defendants highlight that Plaintiffs offered evidence only proved the value Big Bite would have held in December 2021 if it were a 12% member of Ilera II, not how much profit Ilera I lost by not acquiring AB. *Id*. at 38-40. As for the Individual Defendants' use of IHH to submit a letter of commitment and the loan from Healthcare's LOC to consummate the transaction, Defendants likewise point to the absence of any evidence of harm. They assert that the use of IHH as a "placeholder" did not injure Plaintiffs in any way. *Id*. at 36. Since it is undisputed that the Individual Defendants repaid the loan in full, they avow that the use of Healthcare's LOC resulted in no financial loss to Ilera I. *Id*.

We agree with Defendants on both counts. First, the operating agreement of Ilera I disclaimed the fiduciary duty of loyalty as follows:

> No Member shall have any fiduciary obligations with respect to the Company or to the other Members insofar as making other investment opportunities available to the Company or to the other Members. Each Member may, notwithstanding the existence of this Agreement, engage in whatever activities such Member may choose, without having or incurring any obligation to offer any interest in such activities to the Company or to the other Members, subject to the provisions of any non-competition, non-solicitation, non-disclosure agreements or other written agreements between such Person and the Company or its Subsidiaries. Neither this Agreement nor any activities undertaken pursuant hereto shall prevent any Member from engaging in such activities.

- 34 -

Trial Exhibit # 22 at § 6.8(a).

Plaintiffs' argument that "no member" does not actually mean "no member," but only "no member who is not also a manager," is contrary to the unambiguous language of the agreement. "Member" is defined by the Agreement as "each of the members named on Schedule I attached hereto and any person admitted to the Company as a Substituted Member or Additional Members, but only so long as such Person is shown on the Company's books and records as the owner of one or more Units." *Id*. at 10. Schedule I lists each of the Individual Defendants and Big Bite. *Id*. at Schedule I. As such, no person or entity listed in Schedule I was constrained by a fiduciary obligation to offer opportunities to Ilera I or other Ilera I members. Further, since Ilera I is a manager-managed LLC, non-manager members had no statutory duty of loyalty in need of disclaiming.[18] *See* 15 Pa.C.S. § 8849.1(i).

_____

[18] Plaintiffs correctly observe that this Court held in *Retina Associates* that non-manager members have fiduciary duties in some contexts. *See* Plaintiffs' brief at 36 (citing *Retina Associates*, 176 A.3d at 278). However, as we recently observed, "*Retina Associates* was decided under the Pennsylvania Limited Liability Company Law of 1994 ("PLLCL"), which did not expressly delineate the fiduciary obligations of members and managers." *TCS Black Label Realty, LLC v. Serhant Pennsylvania, LLC*, ___A.3d ___, 2026 WL 251144, at *12 (Pa.Super. 2026) (concluding non-manager member's conduct of competing with the company was allowable under the Act). The member duty discussed in *Retina Associates* was not the duty of loyalty at issue herein, but the duty to act in good faith, which the current LLC statute expressly imposes upon non-manager members. *See* 15 Pa.C.S. § 8849.1(d)
*(Footnote Continued Next Page)*

Plaintiff's contention that reference to members and managers elsewhere in the agreement means that mention of only one excludes the other would yield absurd results. For example, the provision cited by Plaintiff states*, inter alia*:

> [T]he debts, obligations[,] and liabilities of the Company, whether arising in contract, tort[,] or otherwise, shall be solely the debts, obligations[,] and liabilities of the Company and no Member or Manager shall be obligated personally for any such the debts, obligations[,] or liability solely by being a Member or acting as a Manager of the Company. Except as otherwise provided in this Agreement, a Member's liability (in its capacity as such) for Company liabilities and Losses shall be limited to the Company's assets; provided that a Member shall be required to return to the Company any Distribution made to it in clear and manifest accounting or similar error.

***Id***. at § 7.1. Meanwhile, § 7.3 provides: "No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company." ***Id***. at § 7.3.

Under Plaintiffs' proffered interpretation, these provisions mean that Big Bite is the only member with a duty to return an erroneous distribution, since manager-members are not expressly included in that portion of § 7.1. Likewise, § 7.3 would deny only Big Bite, but not the manager-members, the

_____

("A member shall discharge the duties and obligations under this title or under the operating agreement and exercise any rights consistent with the contractual obligation of good faith and fair dealing.").

right to own and use Ilera I assets. These are not tenable constructions.[19] Consequently, we conclude that Plaintiffs failed to establish that the Individual Defendants' choice to pursue the acquisition of AB without first offering it to Ilera I was contrary to a fiduciary duty they owed to the company.

We further agree with Defendants that, even if a breach of the duty of loyalty was implicated by the usurpation of the Louisiana opportunity, Plaintiffs also failed to prove the damages element of the claim. As mentioned *supra*, the measure of damages for usurpation of a company opportunity is the profits that the company lost through being deprived of the opportunity. **See CST**, 520 A.2d at 472; **Hill**, 420 A.2d at 1083. Thus, the trial court was unable to award damages for the claim unless Big Bite established what amount of profit Ilera I lost by having opportunities diverted to Ilera II. **See Snyder**, 231 A.3d at 32 ("No damages may be awarded where the evidence is insufficient for the finder of fact to determine what, if any amount, of damages the plaintiff[, *i.e.*, the company,] suffered.").

As we detailed in recounting his trial testimony, in opining as to the fiduciary duty damages, Mr. Eckhardt offered only his estimation of the value of Big Bite's share of the value of the companies usurped by Ilera II. He did not testify to the amount of profits those assets generated and were realized

---

[19] A reasonable explanation for the separate inclusion of "Managers" in § 7.1 is to extend the relief from personal responsibility for company liabilities to any manager who is not also a member, in the event that Ilera I selected a non-member to its board.

by Individual Defendants instead of Ilera I. *See* N.T. Trial, 7/10/24, at 71-85. Consequently, the fiduciary duty count concerning the diversion of AB in violation of the § 8849.2(b)(1)(iii) ("appropriation of a company opportunity") duty of loyalty also fails for want of proof of damages.

Turning to the duty of loyalty codified at § 8849.2(b)(1)(ii) ("use by the manager of the company's property"), the trial evidence unquestionably established that the Individual Defendants breached it through using Ilera I or Healthcare resources in the initial acquisition of AB. However, Plaintiffs did not prove damages resulting from this breach. The evidence was undisputed that the Individual Defendants accounted for the use of the LOC and fully repaid the draw-down. Plaintiffs did not show if or how much interest was incurred by Ilera I from the transaction, or that it was unable to meet other obligations or to pursue other opportunities due to the brief increase in Healthcare's liabilities.

Plaintiffs correctly assert that that there may be liability for breach of a fiduciary duty even in the absence of harm to the company. *See* Plaintiffs' brief at 37 (citing *Hill*, 420 A.2d at 1081). However, that does not mean Big Bite was relieved of its obligation to prove the damages element of the derivative claim. A brief consideration of *Hill* is instructive.

In that case, two breaches of duties owed by the fiduciary to Hill Co. were at issue: (1) corporate fund misuse by a fiduciary loaning Hill Co. funds to his other enterprises at a lower rate than was charged to businesses in

which he held no stake; and (2) diversion of corporate opportunities from Hill Co. to a new company he formed to contract for the same types of jobs that had formerly been done by Hill Co. Regarding the fund misuse, we observed that it mattered not whether Hill Co. was harmed or suffered a loss; the company was entitled to be paid the amount that the fiduciary personally benefited from the low-rate loans. *See Hill*, 420 A.2d at 1081. For the usurpation of Hill Co. opportunities, the court looked to the profits realized by the company to which the jobs were diverted. *Id*. at 1083.

Hence, contrary to Plaintiffs' suggestion, the *Hill* Court did not recognize a right for a company to recover money where there was neither a loss to the company nor a profit to the fiduciary. Instead, *Hill* stands for the proposition that, in the absence of a loss to Ilera I from the use of the resources of Healthcare and IHH, Plaintiffs could have proven the damages element of their corporate-asset-misuse fiduciary duty claim by showing what benefit the Individual Defendants reaped by using Ilera I property instead of non-company resources. The certified record reflects no such evidence.

As such, Plaintiffs failed to prove the necessary elements of either aspect of Ilera I's breach of fiduciary duty claim. The trial court erred in concluding otherwise. Therefore, the court's unallocated damages award is unsustainable to the extent it was premised upon this claim.

We next consider whether the court's finding the Individual Defendants liable for fraud is properly founded in law and facts supported by the record.

To establish a fraud claim, a plaintiff must prove the following elements by clear and convincing evidence:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

***Kostryckyj v. Pentron Lab. Techs., LLC***, 52 A.3d 333, 338 (Pa.Super. 2012) (cleaned up). "[F]raud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word or mouth, of look or gesture." ***Id***. (cleaned up). Where induced by fraud to enter into an agreement, "the victim of fraud in the inducement has two options: (1) rescind the contract, or (2) affirm the contract and sue for damages." ***Eigen v. Textron Lycoming Reciprocating Engine Div.***, 874 A.2d 1179, 1184 (Pa.Super. 2005).

Here, the trial court found that Plaintiffs proved by clear and convincing evidence that the Individual Defendants fraudulently induced Hexter to agree to the equity swap. In particular, they "grossly and recklessly understated the value of Healthcare's Pennsylvania operations by (i) excluding the planned Phase 2 Expansion, and (ii) double-counting Healthcare's debt under the Amended LOC (including the $2.35 million used to acquire [AB]) to artificially reduce Healthcare's purported value." Plaintiffs' Proposed Findings, 8/22/24, at ¶ 216. At the same time they informed Hexter that Healthcare was worth

$59 million, they were telling potential investors that it had a value of $232 million. *Id*. at ¶ 224. Meanwhile, the Individual Defendants "grossly inflated the supposed future value of Louisiana by assuming that [AB] would generate revenues that were more than four times the size of the entire projected Louisiana cannabis market as of December 2018." *Id*. at ¶ 221 (cleaned up). They deliberately presented these mismatched values to Hexter with the intent to deceive her into believing that it was an apples-to-apples comparison such that the giving up two thirds of Big Bite's equity in Ilera I in favor of a 4% stake in Ilera II would increase the overall value of her investment.[20] *Id*. at ¶ 224.

The Individual Defendants, being managers of Healthcare and Ilera I, had more information about the performance and outlook of Healthcare than Hexter, such that Hexter reasonably and justifiably relied on their representations in deciding to have Big Bite accept the proposed equity swap. *Id*. at ¶¶ 231-233. As a result of that reliance, Big Bite suffered damages in the amount of $11,062,949, which Mr. Eckhardt calculated as the difference in value, at the time of the fraud, between what Big Bite surrendered and what it received. *Id*. at ¶¶ 188, 234.

---

[20] While the representations were communicated to Hexter by Gray and Rochlin, all the Individual Defendants acted in concert in inducing Hexter to dilute Big Bite's interest in Ilera I. *See* Plaintiffs' Proposed Findings, 8/22/24, at 44 n.17.

Defendants' assault on these findings is multifaceted. Specifically, they assert: (1) estimated projections of future performance are not actionable as a matter of law; (2) Plaintiffs did not justifiably rely on alleged omissions regarding a corporate opportunity; and (3) reliance on the share transfer analysis is barred by the parol evidence rule.

Defendants' first prong of attack focuses upon the nature of the statements inducing the equity swap. They observe that "a cause of action for fraud must allege a misrepresentation of a past or present material fact." Defendants' brief at 41 (citing, *inter alia*, **Krause v. Great Lakes Holdings, Inc.**, 563 A.2d 1182, 1187 (Pa.Super. 1989)). Contrarily, "representations of something that may happen in the future do not, at least as a general rule, constitute fraud." **Id**. (quoting **Boyd v. Rockwood Area Sch. Dist.**, 907 A.2d 1157, 1170 (Pa.Cmwlth. 2006)). Citing our Supreme Court's decision in **Huddleston v. Infertility Center of America, Inc.**, 700 A.2d 453 (Pa.Super. 1997), as well as several decisions of non-precedential value to this Court, Defendants maintain that earnings forecasts and other statements concerning possible future events are not actionable as fraud. **See** Defendants' brief at 41-42.

In **Huddleston**, the plaintiff contracted with ICA to be a surrogate mother. According to Huddleston, she was induced to participate because "ICA represented its program to be the 'premier' surrogacy program in the country, and that it was designed and implemented to ensure the safety of its

client-participants." *Id*. at 461. ICA also purportedly told her "that her surrogacy situation would be handled as an adoption." *Id*. The man whose son Huddleston ultimately bore through contracting with ICA took physical custody of him from the hospital the day after the birth. That man abused the child, causing severe head and brain injuries that resulted in the baby's death the following month. Huddleston filed wrongful death and survival claims, including one for fraud that the trial court dismissed. Our Supreme Court affirmed, stating:

> The trial court concluded, and we agree, that these representations are not sufficient to support an intent to induce by misrepresentation. ICA's representations regarding the quality of the program amounted to mere "puffing," rather than fraud. And its promise to treat the surrogacy undertaking as an adoption is merely an unfulfilled promise to do something in the future, which does not constitute fraud.

*Id*. at 461 (citations omitted).

Defendants maintain that the representations in the share transfer analysis are likewise unavailing because they are "almost entirely forward-looking estimated projections and potential future values[,] . . . not statements of present or past fact that could support Plaintiffs' fraud claim." Defendants' brief at 42. We disagree.

Big Bite's fraud claim is not premised upon the failure of the Individual Defendants' future projections to bear out. It is founded upon proof that they intentionally led Hexter to believe that the share transfer analysis was "an 'apples to apples' comparison of value," when, as they acknowledged at trial,

it instead compared a highly speculative projection of AB's potential value of $300 million against an artificially-low indication of Healthcare's present value at $59 million. **See** Plaintiffs' brief at 43.[21] Had they given Hexter the same projection for Healthcare's future worth at $232 million that they simultaneously shared with investors, thus offering the apples-to-apples comparison Hexter thought she was receiving, she would have seen that Big Bite's giving up 8% of Ilera I to get 4% of Ilera II was a bad deal. The trial court did not err in concluding that the share transfer analysis contained actionable misrepresentations intended to deceive Big Bite.

Defendants' remaining arguments concerning the fraud verdict both involve the reliance element of the claim. First, they observe that Hexter had access to Ilera I's financial information and the opportunity to review the proposal with counsel, such that she could have verified the accuracy of the Healthcare valuation rather than rely on the share transfer analysis. **See** Defendants' brief at 45-46. Second, they aver that the integration clause contained in the Redemption Agreement negates any justifiable reliance upon representations not included in that writing, for "a party cannot be said to have justifiably relied on prior representations that he has superseded and

---

[21] We again rely upon Plaintiffs to explain and defend the trial court's holdings because Defendants' challenges to the fraud verdict, as with the fiduciary duty findings, were rejected without explanation at the post-trial motions stage and are among those the trial court declined to address in its Rule 1925(a) opinion.

disclaimed through a fully integrated written contract[.]" ***Toy v. Metro. Life Ins. Co.***, 928 A.2d 186, 207 (Pa. 2007) (cited in Defendants' brief at 48-49).

Neither of these arguments persuades us either. Regarding Hexter's reliance upon Gray's representations, as Plaintiffs aptly note, while a person may not justifiably rely upon a statement that is obviously or known to be false, "the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity" in order to justifiably rely upon it. ***See*** Plaintiffs' brief at 44 (quoting ***Egan v. USI Mid-Atl., Inc.***, 92 A.3d 1, 16 (Pa.Super. 2014)) (cleaned up). "Furthermore, where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon." ***Patel v. Kandola Real Estate, LP***, 271 A.3d 421, 427 (Pa.Super. 2021) (cleaned up).

Here, Hexter, who was not a manager of Healthcare or Ilera I and, by the Individual Defendants' estimation was not a competent businessperson, was provided valuations by her business partner, who, as the CFO of Healthcare had the most intimate knowledge of the business's finances and expertise in valuation. Further, Hexter was given mere weeks to elect to make the equity swap, virtually guaranteeing that she would rely upon Gray's share transfer analysis. Under these circumstances, we cannot rule that the trial court erred in holding that Hexter justifiably relied upon the representations of value offered by the Individual Defendants without attempting to

independently verify them in the eleven days she had to decide whether to accept their offer.

Nor are we convinced that the trial court erred in refusing to find Big Bite's fraud claim barred by the parol evidence rule. Our High Court has stated that rule and its application in this context as follows:

> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-37 (Pa. 2004) (cleaned up). In other words, under Pennsylvania law, when the parties' complete agreement is reduced to writing, parol evidence may be offered to establish fraud in the execution, but not to prove fraud in the inducement. *See Rudy v. Lesniak*, 343 A.3d 1261, 1268 (Pa.Super. 2025).

Pennsylvania law for assessing whether a writing constitutes the parties' whole agreement is summarized thusly:

> To determine whether or not a writing is the parties' entire contract, the writing must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties. An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of

the parties' negotiations, conversations, and agreements made prior to its execution.

*Yocca*, 854 A.2d at 436 (cleaned up).

The impact and scope of an integration clause is different under Delaware law. As one court elucidated:

Where the plaintiff alleges the defendant lied in contract negotiations, but the contract says the plaintiff did not rely on the defendant's extracontractual statements, Delaware law recognizes a tension between excusing the defendant's pre-contract lie, and excusing the plaintiff's lie that it was not relying on any extracontractual statements. Delaware law has resolved this tension by requiring specific and unambiguous anti-reliance language to preclude a fraudulent inducement claim based on the defendant's pre-contract statements, as the plaintiff cannot plead justifiable reliance on extracontractual statements when it promised not to rely on them. An integration provision without anti-reliance language does not do the same.

But an integration clause functions to preclude a fraud claim where the extracontractual misrepresentation directly conflicts with an express term in the contract. That result follows from the parol evidence rule: evidence of a prior contradictory agreement cannot be considered to modify the terms of the integrated contract. A contract with an integration clause supersedes the terms of any prior agreement covering the same subject matter. When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement 'needs to be memorialized in the subsequent agreement' to survive.

An integration provision alone precludes consideration of a pre-contract understanding based on extracontractual statements that conflict with the terms of the integrated contract. So the plaintiff cannot plead justifiable reliance on those conflicting and superseded pre-contract extracontractual statements. While an integration provision alone does not preclude reliance on misrepresentations outside the four corners of an agreement, it precludes reliance on precontractual understandings of facts that are found within the four corners of that agreement.

***Park7 Student Hous., LLC v. PR III/Park7 SH Holdings, LLC***, 340 A.3d 614, 618–19 (Del. Ch. 2025) (cleaned up).

Here, Big Bite alleged that Hexter was fraudulently induced into agreeing to the equity swap. As Defendants indicated in their proposed findings and reiterate on appeal, "[u]ltimately, four agreements comprised the equity swap," namely: (1) the Redemption Agreement, governed by Delaware law, by which Big Bite relinquished two-thirds of its shares in Ilera I; (2) the amendment to Ilera I's operating agreement, subject to Pennsylvania law; (3) the subscription and joinder agreement through which Big Bite was issued membership in Ilera II; and (4) the amended operating agreement for Ilera II, governed by Delaware law. ***See*** Defendants' brief at 18-19; ***see also*** Defendants' Proposed Findings, 8/22/24, at ¶ 97.

Defendants advocate for application of the parol evidence rule based upon the integration clause found in one of those four writings, namely the Redemption Agreement. That document indicates that the parties agree to its various terms "in consideration of the promises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged[.]" Trial Exhibit # 191 at 2. Among the miscellaneous provisions of that contract is the following:

> This Agreement and the other instruments referenced herein contain the entire understanding of the parties hereto with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, none of the parties hereto makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may

be waived other than by an instrument in writing signed by the party to be charged with enforcement and no provision of this agreement may be amended other than by an instrument in writing signed by all of the parties.

*Id*. at ¶ 6(c). The only "other instruments" mentioned in the Redemption Agreement appear to be the Ilera I operating agreement, referenced for definitions for capitalized terms, and unspecified "all such other agreements, certificates, instruments[,] and documents as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated thereby." *Id*. at ¶ 6(e).

The trial court held that, construing the Redemption Agreement pursuant to Delaware law, the integration clause did not act to bar parol evidence of fraud in the inducement, since it is merely boilerplate and the Redemption Agreement does not include representations that contradict those that fraudulently induced Hexter to agree to the equity swap on behalf of Big Bite. *See* Plaintiffs' Proposed Findings, 8/22/24, at ¶¶ 280-285.

Defendants counter that the Redemption Agreement's choice-of-law provision does not apply to Big Bite's fraud claim, which is governed by Pennsylvania law. *See* Defendants' brief at 50-51 (citing trial court decisions from federal courts and Philadelphia County). They maintain that Pennsylvania's jurisprudence bars Plaintiffs from establishing that they

justifiably relied on any representations not included in the Redemption Agreement agreement. *Id*. at 49-50.[22]

We conclude that Defendants do not prevail under either jurisdiction's law. If we deem this a matter of construing the Redemption Agreement to discern the meaning of the integration clause, Delaware law applies to render only representations found within the four corners of the writing to have been superseded by its execution. Since the deceitful misrepresentations that underlie Big Bite's fraud claim are not addressed or contradicted by the Redemption Agreement, the integration clause does not preclude the claim. *See Park7 Student Hous.*, 340 A.3d at 618–19.

If we view this as a matter of Pennsylvania law concerning parol evidence, the claim that the equity swap was fraudulently induced is barred only if the Redemption Agreement represents the complete memorialization of the parties' contract. It does not. Defendants readily acknowledge that the full agreement was spread over four separate writings, two of which separately included integration clauses. The Redemption Agreement further vaguely indicates that it is founded upon "other good and valuable consideration" not set forth in the writing. *See* Trial Exhibit # 191 at 2. The evidence pertinent to the fraud allegations speaks to this other consideration

---

[22] In making this argument, Defendants also are guilty of citing an uncitable unpublished memorandum decision filed before May 2, 2019, in violation of 210 Pa. Code § 65.37(B). We have not considered it in rendering our decision.

supporting Big Bite's otherwise-uncompensated voluntary forfeiture of the bulk of its interest in Ilera I. Thus, Defendants have failed to meet the threshold showing for invoking the parol evidence rule, *i.e.*, establishing that the Redemption Agreement is "the parties' entire contract[.]" *Yocca*, 854 A.2d at 436-37 (cleaned up).

For these reasons, we affirm the trial court's finding that the Individual Defendants are liable to Big Bite for fraud. For the reasons noted earlier, awarding damages on this claim to another Plaintiff was improper, as the claim was alleged and proven on behalf of Big Bite, the entity that sustained the loss.[23] Further, as rendered, it is unclear how much of the amount awarded by the trial court pertained to this claim. Upon remand, the court shall issue a new verdict order specifying the amount to which Big Bite is entitled from the Individual Defendants for their fraud.

Defendants next argue that the trial court erred in finding them liable for unjust enrichment and civil conspiracy. They first complain that, unlike its discussions of the fiduciary duty and fraud counts, the trial court's adopted findings and conclusions do not delineate the elements and damages related to these causes of action, but rather merely mentioned these claims in connection with the others. *See* Defendants' brief at 54-55. They further

---

[23] We acknowledge that Hexter is the only member of Big Bite. However, the funds recouped from the loss belong to Big Bite in the first instance, to be held or distributed to Hexter or creditors of Big Bite in accordance with Big Bite's LLC operating agreement.

insist unjust enrichment was not a viable claim since Plaintiffs' relationship with Defendants was governed by contract. Additionally, the Individual Defendants contend that the conspiracy claim fails because "agents of a single entity cannot conspire among themselves."[24] *Id*. at 56.

Defendants are correct that the trial evidence did not prove the cause of action of unjust enrichment. As our Supreme Court has explained: "Unjust enrichment is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution. An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Roethlein v. Portnoff Law Associates, Ltd*., 81 A.3d 816, 825 n.8 (Pa. 2013) (citations omitted). Stated differently, "[u]njust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Spolar*, 326 A.3d at 1003 (cleaned up) (affirming unjust enrichment award requiring a landowner to pay her daughter the amount by which the parcel of land was increased in value as a result of the daughter constructing a house on the property under the mistaken belief that she owned it).

---

[24] Defendants also argued that the conspiracy claim could not survive the failure of the fiduciary duty and fraud claims. *See* Defendants' brief at 55. Our upholding of the fraud finding negates this argument.

The elements of a cause of action for unjust enrichment are: "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Vacula v. Chapman*, 230 A.3d 431, 437 (Pa.Super. 2020) (cleaned up). "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa.Super. 2017) (cleaned up). Moreover, "[a] cause of action for unjust enrichment arises only when a transaction is not subject to a written or express contract." *Heldring v. Lundy Beldecos & Milby, P.C.*, 151 A.3d 634, 645 (Pa.Super. 2016) (cleaned up).

In its Rule 1925(a) opinion, the trial court merely points to its findings that Defendants enriched themselves by breaching their fiduciary duties, which it deemed to be "a fundamental element" of that claim. *See* Trial Court Opinion, 3/4/25, at 10. For their part, Plaintiffs likewise cite unjust enrichment as a measure of fiduciary duty damages rather than fleshing out the elements of the independent cause of action, and assert that the Individual Defendants were unjustly enriched by the breach and their scheme to defraud Hexter. *See* Plaintiffs' brief at 52-53.

From our review of the certified record, we discern no specific evidence or findings as to the elements of an unjust enrichment claim. There is no

indication of any benefit conferred upon the Individual Defendants that was not the subject of one of the parties' express contracts. We have ruled that there was no unjust enrichment proven from a breach of fiduciary duty, and Big Bite will receive the restitution of what the Individual Defendants obtained through their fraud in connection with that count. No separate award sounding in quasi-contract is warranted by the facts before us. Thus, to the extent that the trial court's verdict found in favor of any plaintiff on Count VI of the operative complaint, we reverse that ruling.

Turning to the civil conspiracy count, the trial court rejected Defendants' criticism by indicating that their "conspiratorial actions lie at the heart of this entire litigation, and form the basis for fraud and breach of fiduciary duty." Trial Court Opinion, 3/4/25, at 10. Specific to the fraud claim, the court pointed to the Individual Defendants' decision to convince Hexter that Healthcare was worth less than it was. *Id*. at 10 n.13. As with the separately-pled claim of unjust enrichment, it does not appear that the court imposed liability for the conspiracy distinct from the other implicated claims. Rather, as indicated in its adopted findings, the court utilized the conspiracy as the basis for imputing to all Individual Defendants the fraudulent misrepresentations made by Rochlin and Gray to further their conspiracy. **See** Plaintiffs' Proposed Findings, 8/22/24, at 44 n.17.

The trial court's application of the law in this manner was correct:

Although a cause of action, a civil conspiracy is not a "tort" unto itself. Essentially, it is a theory of vicarious liability that renders

each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether the co-conspirator was a direct actor and regardless of the degree of his or her activity. The acts of any one co-conspirator are deemed the acts of all, so anyone who merely agrees to the plan or design may be held liable for the acts of the others.

*Bert Co. v. Turk*, 257 A.3d 93, 115 (Pa.Super. 2021), *appeal granted on other issues and aff'd*, 298 A.3d 44 (Pa. 2023).

Defendants accurately assert that, under Pennsylvania law, one cannot pursue a conspiracy claim against an entity based upon an agreement among its agents to take actions on behalf of the organization. *See*, *e.g.*, *Grose v. Procter & Gamble Paper Products*, 866 A.2d 437, 441 (Pa.Super. 2005) (observing that company/employer and its supervisors could not conspire to create intolerable working conditions for employee); *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa.Super. 1992) (holding hospital and its agents could not conspire to demote and discharge an employee). Yet, in the case *sub judice*, Big Bite did not allege that the Individual Defendants agreed among themselves to have any company they managed harm Big Bite. Rather, they, as individuals, tricked Hexter into relinquishing part of Big Bite's interest in Ilera I. This was not a company action to benefit or otherwise impact the company, but individual investors seeking to increase their own personal wealth. We find no fault with the trial court's application of civil conspiracy in this case to render the Individual

Defendants jointly and severally liable for the fraudulent misrepresentations of their co-conspirators.

Defendant's last claim of error attacks the trial court's award of attorney fees to Plaintiffs. Based upon our disposition, we deem this issue moot. It is well-settled that, "[u]nder the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." ***Trizechahn Gateway LLC v. Titus***, 976 A.2d 474, 482–83 (Pa. 2009). The only basis asserted by Plaintiffs to recover their fees and costs was § 14.16 of Ilera I's operating agreement, which states:

> If any action, suit[,] or proceeding is brought to enforce or interpret the terms of this agreement or to protect the rights obtained hereunder, or to recover damages for breach of this Agreement, then, if successful in whole or in part in such action, the prevailing party or parties in such action, suit[,] or proceeding shall be entitled to recover from the non-prevailing party or parties hereto any and all of the costs of suit and reasonable attorneys' fees incurred by the prevailing party or parties in connection therewith, including attorneys' fees on appeal, costs and disbursements, in addition to such other relief to which any such prevailing party or parties may be entitled.

Trial Court Exhibit # 22 at ¶ 11.16.

Our rulings above leave Big Bite as the sole prevailing plaintiff, and only as to fraud and civil conspiracy, not as to any claim to enforce or interpret the terms of the operating agreement, to protect any of Big Bite's rights obtained thereunder, or to recover damages for breach of that agreement. In other words, our reversal of the court's verdict in favor of Plaintiffs on the breach of

fiduciary duty claim has destroyed the foundation for granting Plaintiffs' fee petition. In the absence of any other basis to shift the fees, the American rule applies, and we must reverse the trial court's grant of Plaintiffs' fee petition.

In sum, the judgment and the verdict in this case are unsound in that they were entered in favor of parties not entitled to recover, in an amount apparently based in part upon a finding we have reversed, and include fees and costs to which no plaintiff is entitled. We therefore vacate the judgment and the verdict, and reverse the order granting Plaintiffs' fee petition. We affirm the finding that the Individual Defendants are liable to Big Bite for fraud and conspiracy, but otherwise reverse the findings in favor of Plaintiffs. We remand this case with instructions for the trial court to issue a new verdict: (1) finding in favor of Big Bite on its fraud and conspiracy counts and specifying the amount of damages to which the Individual Defendants are liable to Big Bite for those claims; and (2) finding in favor of Defendants as to all remaining counts. The parties may thereafter file post-trial motions concerning the new verdict prior to entry of judgment thereupon.

Judgment and verdict vacated. Fee petition order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/8/2026